BETHSAIDA TORRES ET AL. *v.* CITY OF
WATERBURY ET AL.
(SC 16051)

Callahan, C. J., and Norcott, Katz, Palmer and Peters, Js.

Argued March 16—officially released June 1, 1999

*Raymond J. Antonacci*, for the appellants (plaintiffs).

*Charles E. Oman III*, assistant corporation counsel, for the appellees (defendants).

*Opinion*

KATZ J. The principal issue in this tax appeal is whether, under the circumstances of this case, the defendant tax assessor (defendant assessor) of the named defendant, the city of Waterbury (city),[1] failed, when he assessed the condominium units at issue in this appeal, to comply with General Statutes (Rev. to 1997) § 12-64,[2] which requires that all nonexempt property be taxed at a uniform rate. We conclude that the

---

[1] The three defendants in this case are the city, the defendant assessor, and the city's board of tax review.

[2] We note that this appeal, originally from the 1994 tax assessment and later amended to include the assessments for the subsequent three years, involves the 1993, 1995 and 1997 revisions of the General Statutes. For purposes of clarity, initial references herein to the statutes governing revalua-

trial court properly found that the defendant assessor
had complied with the statute.

The following facts and procedural history are perti-
nent to this appeal. Relying upon the work of a certified
revaluation company,[3] the city implemented its last gen-
eral revaluation of property, pursuant to General Stat-
utes (Rev. to 1997) § 12-62,[4] on October 1, 1980. In 1987,

tion are to the 1997 revision. While many of the changes during the relevant
time period were technical in nature and not pertinent to this appeal, some
were more substantive, such as the 1995 amendment changing the time for
revaluation from every ten years to every twelve years. See Public Acts 1995,
No. 95-283, § 3. The statutory requirement at issue in this case, however—that
nonexempt property be taxed at a uniform rate—has remained unchanged.

General Statutes (Rev. to 1997) § 12-64 provides in relevant part: "Real
estate liable to taxation. Easements in air space. Separate assessment of the
interest of a lessee. Conditions under which lessee of state-owned property is
subject to tax. (a) All the following-mentioned property, not exempted, shall
be set in the list of the town where it is situated and, except as otherwise
provided by law, shall be liable to taxation at a uniform percentage of its
present true and actual valuation, not exceeding one hundred per cent of
such valuation, to be determined by the assessors: Dwelling houses, garages,
barns, sheds, stores, shops, mills, buildings used for business, commercial,
financial, manufacturing, mercantile and trading purposes, ice houses, ware-
houses, silos, all other buildings and structures, house lots, all other building
lots and improvements thereon and thereto, agricultural lands, shellfish
lands, all other lands and improvements thereon and thereto, quarries, mines,
ore beds, fisheries, property in fish pounds, machinery and easements to
use air space whether or not contiguous to the surface of the ground. . . ."

[3] The revaluation was conducted by Trumbull McQuirk Associates.

[4] General Statutes (Rev. to 1997) § 12-62 provides in relevant part: "Peri-
odic physical and statistical revaluation of real estate. (a) (1) (A) The asses-
sor or board of assessors of each town which levies real property taxes on
the basis of a revaluation that was implemented for an assessment year
commencing on or before October 1, 1986, shall, for the assessment year
commencing October 1, 1997, revalue all real property for assessment pur-
poses by physical observation . . . .

"(2) For the assessment year commencing not later than twelve years
following the revaluation by physical observation of all real property required
under subdivision (1) of this subsection or under subsection (g) of this
section and not later than every twelve years thereafter, the assessors of
all towns, consolidated towns and cities and consolidated towns and bor-
oughs or their designees shall revalue all of the real estate in their respective
municipalities for assessment purposes by means of physical observation.
In addition to any statistical revaluation required under subdivision (1) of

the condominium units in a complex called Lakewood Village were first entered onto the city's grand lists. Claiming to be aggrieved by the actions of the defendant assessor, the plaintiffs—twenty-seven owners of nineteen units in Lakewood Village—challenged the assessments of their units (Lakewood units) that appeared on the grand list of 1994. On February 28, 1995, the plaintiffs appeared before the defendant Waterbury board of tax review (board) and, on March 9, 1995, the board dismissed the plaintiffs' appeal. Thereafter, pursuant to General Statutes (Rev. to 1995) § 12-117a,[5]

this subsection, not later than every four years following each physical revaluation conducted pursuant to said subdivision (1) or subsection (g) of this section and this subdivision, such assessors or their designees shall revalue all real property for assessment purposes by use of a statistical method of adjusting the value, without a physical observation, reflecting any change in the value of such real estate as compared to its value determined for the purposes of said immediately preceding revaluation.

"(3) The assessments derived from each physical and statistical revaluation under subdivisions (1) and (2) of this subsection shall be used for the purpose of levying property taxes in such municipality in the assessment year in which such revaluation becomes effective and in each assessment year thereafter until the next succeeding revaluation in accordance with this section becomes effective. In the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors. An assessor shall have fulfilled the requirement to view by physical inspection if a physical inspection of a property has been made at any time from the assessment date of the immediately preceding statistical revaluation to the assessment date of the succeeding revaluation by physical inspection. Nothing in this subsection shall be construed as prohibiting a town from effecting more frequent revaluations by means of either physical observation or a statistical method of adjusting assessed valuations, provided no more than twelve years shall elapse between the implementation of each physical revaluation and a statistical revaluation shall be implemented no less than every four years between the implementation of each physical revaluation.

"(b) Except as provided in subdivision (1) of subsection (a) of this section, nothing in this section shall be construed to extend the period between revaluations made by viewing beyond twelve years. The Secretary of the Office of Policy and Management shall adopt regulations concerning acceptable methods for use by a municipality in conducting a revaluation by use of statistical adjustments in value. . . ."

[5] General Statutes (Rev. to 1995) § 12-117a provides: "Appeals from decisions of boards of tax review concerning assessment lists for assessment

the plaintiffs appealed to the Superior Court. The complaint was amended to include the assessments on the

years commencing October 1, 1989, to October 1, 1992. Notwithstanding the provisions of sections 12-118, 12-121aa and 12-121bb, any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review in any town or city with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, or October 1, 1994, may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court, and the pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and costs, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and costs. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and costs. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

grand lists of 1995, 1996 and 1997, in addition to the 1994 assessment that had been the basis of the plaintiffs' original challenge.

The complaint alleged that the values placed upon the Lakewood units were "grossly excessive, disproportionate and unlawful" and were not a percentage of the units' true and actual values as of the dates of the respective grand lists in violation of § 12-64. The complaint also alleged that the defendant assessor had "failed to establish a uniform percentage of fair value for uniform application to all property within the town, in violation of [§] 12-64" and that the defendant assessor had "applied a nonuniform percentage of 70 [percent]." The defendants denied the material allegations in the complaint.

On November 5, 1997, the case was tried in the Superior Court, with the plaintiffs seeking a reduction in their assessments from the assessed values of $22,950 for a one floor unit or "flat," $24,030 for an end flat and $25,920 for a townhouse, to $8300, $10,500 and $11,040, respectively.[6] A total of three witnesses were called by the parties. They were: (1) Walter Kloss, a licensed real estate appraiser, called by the plaintiffs; (2) Robert Ghent, an attorney, called by the defendants; and (3) Michael Moriarty, a former assessor for the city, also called by the defendants. The relevant portions of their testimonies will be summarized later in this

---

[6] The plaintiffs base their proposed assessed values on the values of several units in Woodhaven Condominiums (Woodhaven), another complex in Waterbury. The values of the Woodhaven units were stipulated to in *Ghent v. Board of Tax Review*, judicial district of Waterbury, Docket No. CV-92-0109836S (September 8, 1995), with adjustments made for differences in value between the Woodhaven and Lakewood complexes, as testified to by Walter Kloss, the plaintiffs' expert. See footnote 12 of this opinion. We discuss both the *Ghent* judgment and the testimony of the plaintiffs' expert in parts IV and II A of this opinion, respectively.

opinion. Additionally, various documents were admitted into evidence, including a statement of facts stipulated to by the parties.[7]

On May 8, 1998, the trial court dismissed the appeal. In essence, the trial court was not persuaded by statistical evidence presented by the plaintiffs or by the plaintiffs' appraiser's interpretation of that evidence offered to prove that the defendant assessor had failed to follow statutory requirements in valuing the plaintiffs' property. Additionally, the court found the plaintiffs' method of valuing the Lakewood units to be unsuitable in the present case. The trial court concluded further that the defendant appraiser was not bound by the values agreed to in the Superior Court case of *Ghent* v. *Board of Tax Review*, judicial district of Waterbury, Docket No. CV-92-109836S (September 8, 1995) (1995 stipulated judgment). In that case, the parties had stipulated to the values of certain condominium units in a complex known as Woodhaven Condominiums (Woodhaven), which the parties to the present appeal had stipulated were the only units that could be used appropriately as "comparables" for valuing the Lakewood units. Finally, the court noted that the valuation method employed by the defendant assessor, the "comparable sales approach," was a proper valuation method. Based on the foregoing, the trial court concluded that the valuations of the Lakewood units determined by the defendant assessor were not excessive. Consequently, the court rendered judgment for the defendants. We

[7] Also admitted into evidence were: (1) a memorandum of decision in a Superior Court case, *Ghent* v. *Board of Tax Review*, judicial district of Waterbury, Docket No. 54165 (April 13, 1983); (2) certain assessors' property cards; (3) a certified copy of the 1980 sales to assessment ratios for real property in the city as prepared by the state office of policy and management; and (4) a copy of a stipulated judgment in *Ghent* v. *Board of Tax Review*, judicial district of Waterbury, Docket No. CV-92-0109836S (September 8, 1995).

will provide additional facts and discussion of the trial court's opinion as needed.

The plaintiffs appealed to the Appellate Court from the trial court's judgment and, pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c), we transferred the appeal to this court. On appeal, the plaintiffs make the following three claims. First, they claim that the trial court improperly found that the defendant assessor had complied with the requirements of § 12-64. Second, they argue that the trial court improperly found that the plaintiffs had not met their burden of proving that their property had been overvalued and, consequently, improperly dismissed their appeal. Third, they claim that the trial court improperly disregarded the 1995 stipulated judgment that had been offered by the plaintiffs to establish the values of the Woodhaven units used by the parties as comparables for the purpose of valuing the Lakewood units.[8] We are not persuaded by the plaintiffs' arguments and, therefore, we affirm the trial court's judgment.

I

Before considering the merits of the parties' arguments, we set forth the basic legal principles and standard of review applicable to this appeal. Recently, in *Ireland* v. *Wethersfield*, 242 Conn. 550, 698 A.2d 888 (1997), we reiterated the legal tenets governing tax appeals brought pursuant to § 12-117a, stating: "[T]he trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property. . . . At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. . . .

---

[8] Alternatively, the plaintiffs argue that the value of a certain Woodhaven unit established in a different prior action, decided in 1983, should have been used by the defendant assessor as the comparable for valuing the units at issue in this appeal. As we discuss in part IV A of this opinion, the plaintiffs failed to preserve this claim, and we therefore decline to consider it.

The trier of fact must arrive at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value."[9] (Internal quotation marks omitted.) Id., 556–57, quoting *Xerox Corp.* v. *Board of Tax Review*, 240 Conn. 192, 204, 690 A.2d 389 (1997). "If the trial court finds that the taxpayer has failed to meet his burden because, for example, the court finds unpersuasive the method of valuation espoused by the taxpayer's appraiser, the trial court may render judgment for the town on that basis alone." *Ireland* v. *Wethersfield*, supra, 557–58. "A taxpayer . . . who fails to carry [the burden of establishing overvaluation] has no right to complain if the trial court accords controlling weight to the assessor's valuation of his property." Id., 559.

An appellate court's review of a trial court decision is circumscribed by the appropriate standard of review. As we have often stated: "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in

---

[9] In *Ireland* v. *Wethersfield*, supra, 242 Conn. 557 n.5, we recognized "that there may be a tension, not explicitly resolved in our case law, between the proposition that the trial court hears a tax appeal de novo and the proposition that the trial court may defer to an assessor's valuation in deciding the true and actual value of the taxpayer's property." In that case, we did not resolve that issue as it was neither encompassed within the certified question nor discussed in the briefs or at oral argument. Because the same holds true in the present appeal, we similarly leave consideration of the issue for another day.

the record." (Internal quotation marks omitted.) *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163, 671 A.2d 813 (1996).

With these basic principles in mind, we consider each of the claims on appeal.

## II

The plaintiffs first claim that the defendant assessor failed to comply with the requirements of § 12-64 when he assessed the Lakewood units for their first appearance on the city's grand list in 1987. According to the plaintiffs, this rendered improper the 1994 through 1997 assessments, which are at issue in this appeal and which are based on the original assessment. We disagree.

Before considering this claim, we note the statutes pertinent to this issue. General Statutes (Rev. to 1997) § 12-62a (b) provides in relevant part that "[e]ach . . . municipality shall . . . assess all property for purposes of the local property tax at a uniform rate of seventy per cent of present true and actual value . . . ." General Statutes (Rev. to 1997) § 12-64 (a) provides in part that all nonexempt real estate "shall be liable to taxation at a uniform percentage of its present true and actual valuation, not exceeding one hundred per cent of such valuation, to be determined by the assessors . . . ." Section 12-64 "then sets forth a three step procedure for carrying out the statute's mandate: '(a) The fair value of property as of the assessment date must be determined. (b) A percent, not exceeding 100 percent, of the fair value, must be determined by the assessing authority for uniform application to all property within the town. (c) The assessment value, i.e., the value for the purpose of taxation, for any given piece of property in the town, must be ascertained by applying the determined uniform percent to its fair value as of the assessment date.' " *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 434, 525 A.2d 91 (1987), quoting

*Lerner Shops of Connecticut, Inc.* v. *Waterbury*, 151 Conn. 79, 85, 193 A.2d 472 (1963).

A

The facts surrounding the assessment of the Lakewood units, as well as the methodologies proposed by both parties for valuing and assessing the units, are complex. Because an understanding of them is essential to our resolution of this issue, we begin with a brief historical overview.

The Lakewood units first appeared on the city's grand list in 1987. The last revaluation in Waterbury was implemented on October 1, 1980. The parties agree that, pursuant to General Statutes (Rev. to 1997) § 12-53a (c),[10]

[10] General Statutes (Rev. to 1997) § 12-53a provides in relevant part: "Assessment and taxation of new real estate construction. (a) Completed new construction of real estate completed after any assessment date shall be liable for the payment of municipal taxes from the date the certificate of occupancy is issued or the date on which such new construction is first used for the purpose for which same was constructed, whichever is the earlier, prorated for the assessment year in which the new construction is completed. Said prorated tax shall be computed on the basis of the rate of tax applicable with respect to such property, including the applicable rate of tax in any tax district in which such property is subject to tax following completion of such new construction, on the date such property becomes liable for such prorated tax in accordance with this section.

"(b) The building inspector issuing the certificate shall, within ten days after issuing the same, notify, in writing, the assessor of the town in which the property is situated.

"(c) Not later than ninety days after receipt by the assessor of such notice from the building inspector or from a determination by the assessor that such new construction is being used for the purpose for which same was constructed, the assessor shall determine the increment by which assessment for the completed construction exceeds the assessment on the taxable grand list for the immediately preceding assessment date. He shall prorate such amount from the date of issuance of the certificate of occupancy or the date on which such new construction was first used for the purpose for which same was constructed, as the case may be, to the assessment date immediately following and shall add said increment as so prorated to the taxable grand list for the immediately preceding assessment date and shall within five days notify the record owner as appearing on such grand list and the tax collector of the municipality of such additional assessment. Such notice shall include information describing the manner in which an

the value of property constructed between general revaluations should relate back to the last preceding revaluation, that is, it should be assessed as if the property had been in existence at that time. See *Newbury Commons Ltd. Partnership* v. *Stamford,* 226 Conn. 92, 102–103, 626 A.2d 1292 (1993). It was incumbent upon the defendant assessor, therefore, to estimate the value that the Lakewood units would have had on October 1, 1980, the date of the last general revaluation, if the units had existed at that time. The parties advance different methods of determining this estimated value.

The parties stipulated to the fact that the Woodhaven units were the only properties that the defendant assessor could use appropriately as comparables to establish the value of a condominium unit at the time of Lakewood's appearance on the city's grand list in 1987, because Woodhaven was the only condominium complex on the grand list of October 1, 1980, with sales activity.[11] At trial, the defendants' expert, Moriarty, a former assessor for the city, testified that, although he personally had not assessed the Lakewood units in 1987, he had been "present in the office at the time" and had "worked closely with the people that were specifically charged with that duty." Moriarty testified that the defendant assessor had "tried to determine what the value would have been had [the units] been built in 1980," by "compar[ing] them to units, similar units that had sold in 1980," and that "then the assessment would represent 70 percent of that value." This method is known as the "comparable sales method."

appeal may be filed with the board of assessment appeals. Notwithstanding the provisions of this subsection, for new construction completed after October first but before February first in any assessment year, the assessor shall, not later than ninety days after completion of the duties of the board of assessment appeals, determine the increment in accordance with this subsection. . . ."

[11] Although there was testimony that there was another condominium complex on the city's grand list on October 1, 1980, at that time there had been no sales of any units other than those in Woodhaven.

Moriarty testified that, in order to arrive at a value for the Lakewood units, based on the value of Woodhaven units, "the first step would have been to determine the assessment per square foot of Woodhaven, based on [the units'] selling price in 1980, and then apply that to Lakewood with some adjustments . . . for different amenities that were available in Lakewood that [were not] available in Woodhaven," taking into account the age of the respective units. By determining the value of one square foot of a Woodhaven condominium unit, making the appropriate adjustments, and multiplying the resulting figure by 70 percent, the defendant assessor arrived at a per square foot assessed value of $25.20 for a Lakewood unit. By multiplying that assessed value by the number of square feet in a given unit, the defendant assessor arrived at the assessed value of that unit.

The plaintiffs' appraiser, Kloss, employed a different method of valuing the Woodhaven units. He testified that he first developed assessment to sales ratios for both single-family homes and condominiums for the years 1980, 1985, 1990 and 1995. He then concluded that the period between 1990 and 1991 was a stable one in the condominium market in Waterbury. Accordingly, he surveyed sales of Woodhaven units during those years and trended them back to 1980. Finally, determining that the Lakewood units were worth 8 percent less than the Woodhaven units, Kloss reduced the 1980 Woodhaven values accordingly.[12]

---

[12] It is worth noting that although Kloss, the plaintiffs' expert appraiser, testified ultimately that a uniform tax assessment for the Lakewood units should be $14,720 for middle townhouse, $15,460 for end townhouses, $11,040 for interior flats, and $13,980 for end flats, at trial, the plaintiffs disregarded these values and sought a reduction of their assessments to $11,040 for a townhouse, $8300 for an interior flat, and $10,500 for an end flat. The plaintiffs based their proposed assessed values on the values of certain Woodhaven units established in the 1995 stipulated judgment. The plaintiffs took those stipulated values and reduced them by 8 percent to account for the difference in value between the two condominium complexes, as testified to by Kloss.

"It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. *Kimberly-Clark Corporation* v. *Dubno*, 204 Conn. 137, 153, 527 A.2d 679 (1987). The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony he reasonably believes to be credible. . . . *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 378, 525 A.2d 68 (1987). On appeal, we do not retry the facts or pass on the credibility of witnesses. *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 473, 542 A.2d 692 (1988)." (Internal quotation marks omitted.) *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 226 Conn. 99.

In the present case, the trial court was not persuaded by the methodology employed by Kloss, the plaintiffs' appraiser, finding it "difficult to accept trending back values from 1990 and 1991 to 1980 when the key issue is the 1987 value of the Lakewood units trended back to 1980." In rejecting the method of the plaintiffs' expert, the court noted that "[t]he Waterbury assessor would not have had 1990–91 sales available to him as of the time he added the Lakewood units to the grand list in 1987, regardless of whether 1990–91 was the most stable period of condominium sales."[13] We reiterate that a trial court is afforded wide discretion in making factual findings and may properly render judgment for a town based solely upon its finding that the method of valuation espoused by a taxpayer's appraiser is unpersuasive. *Ireland* v. *Wethersfield*, supra, 242 Conn. 558.

In this case, the trial court, in rejecting the methodology of the plaintiffs' expert, noted that the comparable

[13] Kloss himself characterized his analysis not as a critique of what the defendant assessor did in 1987, but, rather, as "just a study of what happened after it." We note, however, that what is at issue in this case is the propriety of the defendant assessor's actions in 1987.

sales approach, used by the defendant assessor to determine the value of the Lakewood units,[14] is the method generally used by appraisers in valuing condominiums.[15] Moreover, Moriarty, the defendants' expert, had been employed in various positions in the city's tax assessor's office for twenty years until approximately one and one-half years before the time of his testimony. His testimony, which included, inter alia, the statement that the property on the city's 1980 grand list had been assessed at a uniform rate of 70 percent, was the only direct evidence presented at trial on the method the assessor's office used to value the Lakewood units and to assess them for the purpose of taxation. The trial court was entitled to credit that testimony. See *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 226 Conn. 99.

Nevertheless, the plaintiffs question the defendant assessor's assessment of the Lakewood units, placing great reliance on statistics compiled by the state office of policy and management. The office of policy and management, pursuant to General Statutes § 10-261a (a), has a statutory duty to "determine annually for each town the ratio of the assessed valuation of real property for purposes of the property tax and the fair market value of such property as determined from records of actual sales of such property and from such other data and statistical techniques as deemed appropriate by the secretary [of the office of policy and management]." The office of policy and management statistics, which

[14] The trial court remarked upon the scarcity of evidence offered by the plaintiffs to challenge the reasonableness of the defendant assessor's square foot value for the Lakewood units, noting that such evidence was limited to Kloss' testimony that the Woodhaven location was 8 percent more desirable than the Lakewood location.

[15] Although we do not pass on what method of valuation would be most appropriate in this case, we note that the plaintiffs' expert acknowledged that the comparable sales method is "the best traditional method for an appraisal of a condominium . . . ."

were admitted into evidence at trial, purport to demonstrate an assessment to sales ratio of residential property sold in Waterbury in 1980 of 52.4 percent. According to the plaintiffs, therefore, even though the defendant assessor applied a 70 percent assessment rate to the Lakewood units, as required by § 12-62a (b), by doing so, he violated the uniformity requirement of § 12-64 (a). In essence, the plaintiffs argue that, because residential property in Waterbury, according to the office of policy and management statistics, was assessed at 52.4 percent[16] of its fair value in 1980, the defendant assessor, by assessing the Lakewood units at a 70 percent rate in accordance with § 12-62a (b), applied an assessment rate that was nonuniform in violation of § 12-64.[17]

"It is for the trial court, in the first instance, to determine what limits shall be placed upon the nature and

[16] The plaintiffs consistently compare the 70 percent assessment rate applied to the Lakewood units to the 52.4 percent sales to assessed value ratio listed in the office of policy and management statistics for residential property. Although, hereinafter, we conclude that the trial court reasonably rejected the use of those statistics, for the sake of accuracy we note that the 52.4 percent rate would not be the proper basis for comparison even if this court were to apply the office of policy and management statistics. Although the statistics list 725 residential sales, they also list ninety-six commercial, industrial and utility properties, all of which fall under the types of nonexempt property subject to the uniformity requirement of § 12-64. According to the office of policy and management statistics, those ninety-six properties, which would have to be included in the calculation used to determine the assessment ratio average for all nonexempt property in Waterbury, had an average assessed ratio of 67.6 percent.

[17] We recognize that there might exist a tension, in limited circumstances, between § 12-64 (a), which requires that all nonexempt property be taxed at a uniform percentage, and § 12-62a (b), which requires that all property be assessed for the purposes of local property tax at a uniform rate of 70 percent. There is nothing in the legislative history of these two statutes to resolve this potential conflict. Because the trial court was not persuaded by the evidence offered to prove the application of a nonuniform assessment percentage, and because we affirm herein the trial court's exercise of its discretion in this factual finding, we need not resolve this potential conflict which, circumstances permitting, would be better left to the legislature to resolve.

extent of the evidence to be admitted, and, after its admission, whether it has sufficient probative force to warrant a finding that it is more probable than not that a particular average ratio has been established by the evidence and that such a ratio would provide a fair basis for relief." *Lerner Shops of Connecticut, Inc.* v. *Waterbury*, supra, 151 Conn. 88–89.

The trial court admitted the office of policy and management statistics into evidence but ultimately found them, and their interpretation by the plaintiffs' expert appraiser, to be unpersuasive to show that the defendant assessor had failed to follow the statutory requirements of § 12-64.[18] As we noted previously, this court stated recently that "[i]f the trial court finds that the taxpayer has failed to meet his burden [of proving that his tax assessment was excessive] because, for example, the court finds unpersuasive the method of valuation espoused by the taxpayer's appraiser, the trial court may render judgment for the town on that basis alone."[19] *Ireland* v. *Wethersfield*, supra, 242 Conn. 557–58.

---

[18] The trial court stated: "[The office of policy and management] arrived at a ratio of 52.4 [percent] by taking 725 residential sales made in 1980 in Waterbury and divid[ing] the total net assessments of the 725 sales by the equalized value of the 725 sales, i.e., $438,920,164 divided by $837,633,901 is 52.4 percent. The plaintiffs argue that since Lakewood would have been assessed at 70 [percent] of value in 1980, other residential property in 1980 was being assessed 25 [percent] less than Lakewood. We disagree. The residential sales in Waterbury used by [the office of policy and management] included all single-family homes as well as condominiums. Multifamily residential units were excluded from this [office of policy and management] survey. Kloss acknowledged that the sales market for single family homes and for condominiums are not the same. We agree." The court then stated that it was not persuaded by the statistics or by Kloss' interpretation of them.

Although Kloss testified that the office of policy and management statistics did in fact include multifamily residences, this fact does not convince us that the trial court improperly discounted the persuasiveness of the statistics, in light of the several other sound reasons for doing so that are discussed in this opinion.

[19] In addition to the reasons identified by the trial court for discounting the persuasiveness of the office of policy and management statistics, we question on other grounds the applicability of the statistics to the present case. The statistics, including the sales to assessment ratio relied upon by

Finally, the plaintiffs note that the average ratio method has been recognized by this court as an appropriate method of demonstrating the unfairness of a specific general valuation. See, e.g., *Uniroyal, Inc.* v. *Board of Tax Review*, 182 Conn. 619, 623–24, 438 A.2d 782 (1981); *Kays, Inc.* v. *Board of Tax Review*, 170 Conn. 477, 481, 365 A.2d 1207 (1976); *Lerner Shops of Connecticut, Inc.* v. *Waterbury*, supra, 151 Conn. 90. In *Kays, Inc.* v. *Board of Tax Review*, supra, 481, this court stated that evidence of an average ratio out of line with an individual assessment could serve as the basis for a reduction of the individual assessment *"if that evidence was credited by the trial court . . . ."* (Emphasis added; internal quotation marks omitted.) We do not dispute that the average ratio method may be advanced by a taxpayer at trial, or that a trial court persuaded by such evidence could properly order a reduction in the taxpayer's assessment. In the present case, however, the trial court was *not* persuaded by the plaintiffs' average ratio evidence or by the testimony of the plaintiffs'

the plaintiffs, were developed pursuant to § 10-261a, which is titled "Equalized net grand lists for purposes of educational equalization grants," and which requires the office of policy and management to compile data used to determine the amount of educational grants payable to towns. Although the office of policy and managment has certain duties related to the property tax assessment scheme; see, e.g., General Statutes § 12-2b (1) (requiring it to develop regulations setting forth standards and tests for certifying revaluation companies and their employees); General Statutes § 12-7 (requiring it to collate and prepare statistics concerning assessment and collection of taxes during preceding year and to print so much of report as to show methods and manner of assessment and tax collection); the statistics have no statutorily prescribed role with respect to the tax assessment function. Thus, the trial court reasonably could have declined the plaintiffs' invitation to take the statistics out of context and attach to them a significance apparently unintended by the legislature. Taken to the extreme, such use of the office of policy and management statistics would suggest that, rather than conduct general revaluations, assessors should be free simply to rely upon the statistics for a given year. This is contrary to the statutory scheme, however, and certainly was not within the legislature's contemplation when it established the assessment scheme or the scheme for equalizing the grand lists for the purposes of distributing educational grants.

appraiser interpreting that evidence. Therefore, although the trial court *could* have credited that evidence and testimony, it was not obligated to do so. As this court has stated: "[W]e have carefully limited use of the [average] ratio as a remedy to cases where the evidence *clearly* establishes that the assessor failed to follow the requirements of . . . § 12-64." (Emphasis added.) *Uniroyal, Inc.* v. *Board of Tax Review,* supra, 624. No such clear establishment was achieved in the present case.

The trial court was presented with conflicting testimony, with the plaintiffs' expert testifying that the properties on the city's grand list in 1980 were assessed at an average of 52.4 percent and the defendants' expert testifying that the properties were assessed at 70 percent. "[I]t is the proper function of the court to give credence to one expert over the other"; *Newbury Commons Ltd. Partnership* v. *Stamford,* supra, 226 Conn. 100; and, therefore, it was the trial court's prerogative to find unpersuasive the plaintiffs' evidence and the testimony of their expert.

To summarize, on the evidence presented and the testimony elicited at trial, in light of the traditionally high level of deference appellate courts give to a trial court's findings of fact; see *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.,* 238 Conn. 216, 232, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997) (appellate court's review of trial court's findings of fact "is limited to deciding whether such findings were clearly erroneous" [internal quotation marks omitted]); we cannot say that the trial court acted improperly in discounting the persuasiveness of the office of policy and management statistics or the testimony of the plaintiffs' expert. See *Newbury Commons Ltd. Partnership* v. *Stamford,* supra, 226 Conn. 99–100. We see no reason, therefore, to disturb the discretion of the trial court to determine

the credibility of witnesses and to weigh evidence in reaching its conclusion that the assessor did not violate the uniformity requirement of § 12-64.

B

The plaintiffs make a second argument challenging the uniformity of the assessment of the Lakewood units when compared with those of the properties on the 1980 grand list. The 1980 general revaluation of property in Waterbury was conducted by a revaluation company.[20] On cross-examination, Moriarty, the defendants' expert, testified that, in determining the fair market value for the Lakewood units, the defendant assessor disregarded the revaluation company's values for the Woodhaven units—the only comparables for the Lakewood units—and made his own determination of the Woodhaven units' values. According to the plaintiffs, because all other residential property in Waterbury was valued at the same time by the same revaluation company, the uniformity required by § 12-64 was destroyed. The plaintiffs' argument, however, wilts under examination because the plaintiffs misapprehend the nature of the uniformity requirement of § 12-64.

General Statutes (Rev. to 1997) § 12-64 (a) provides in relevant part that all nonexempt property "shall be liable to taxation at a uniform percentage of its present true and actual valuation, not exceeding one hundred per cent of such valuation, to be determined by the assessors . . . ." The plain terms of the statute demonstrate that it is the percentage applied to the present true and actual valuations that must be uniform, not the valuations themselves. There is nothing in § 12-64 or in our interpretation of it to indicate otherwise. With respect to determining the valuation of the property to be assessed for purposes of taxation, an assessor's goal

---

[20] See footnote 3 of this opinion.

should be to determine that valuation as accurately as possible. That is what the defendant assessor did.

Moriarty testified that the defendant assessor had determined that the revaluation company's values for approximately 3500 properties, including the Woodhaven units, were incorrect. Therefore, rather than apply the statutorily mandated 70 percent assessment rate to an incorrect value of the Lakewood units, the values of which were based on an incorrect fair value of the Woodhaven units, the defendant assessor determined a more accurate fair value of the Woodhaven units. Consequently, this allowed him to determine a more accurate value for the Lakewood units against which to apply the statutory assessment rate of 70 percent, which, according to Moriarty's testimony, was also applied to the other property on the 1980 grand list. Therefore, the uniformity requirement of § 12-64 was not violated by the defendant assessor's substitution of his own values of the Woodhaven units for those of the revaluation company. Accordingly, we hold that the trial court did not act improperly in finding that the defendant assessor had complied with the requirements of § 12-64.

### III

Our resolution of the first issue also disposes of the plaintiffs' second issue, that is, whether the trial court improperly concluded that the plaintiffs had not sustained their burden of proof and improperly dismissed their appeal. For support, the plaintiffs cite our opinion in *Ireland* v. *Wethersfield*, supra, 242 Conn. 558, in which we stated that if "the trial court finds that the taxpayer, in light of the persuasiveness, for example, of his appraiser, has demonstrated an overvaluation of his property, the trial court must then undertake a further inquiry to determine the amount of the reassessment that would be just." The plaintiffs note that, in

*Ireland,* we went on to declare that it is in cases "in which the taxpayer *has* met his initial burden of proving overvaluation, that we have noted the trial court's discretionary authority to find value and have declined to assign presumptive validity to the town's assessment figure." (Emphasis in original.) Id.

The plaintiffs' reliance on *Ireland* is misplaced. The preceding quoted language makes clear that *Ireland* would bolster the plaintiffs' argument only if the trial court had found that the plaintiffs had met their initial burden of proving overvaluation. The trial court found to the contrary, however, and we found no fault with the court's finding. Additionally, the example we provided in *Ireland* of a circumstance in which reassessment might be appropriate—that the trial court finds that the taxpayer, in light of the persuasiveness of his appraiser, has demonstrated overvaluation—is of no help to the plaintiffs in the present case because the trial court stated expressly that it had *not* been persuaded by the testimony of the plaintiffs' appraiser.

Therefore, we conclude that the trial court did not act improperly in finding that the plaintiffs had not met their burden of proving overvaluation of the Lakewood units and, consequently, in dismissing their appeal.

IV

The plaintiffs' remaining argument is that the trial court improperly disregarded the 1995 stipulated judgment in *Ghent* v. *Board of Tax Review,* supra, Docket No. CV-92-0109836S, in determining the value of the Lakewood units. Alternatively, the plaintiffs argue that we should grant relief based upon another prior judgment, *Ghent* v. *Board of Tax Review,* judicial district of Waterbury, Docket No. 54165 (April 13, 1983) (1983 decision). We reject both of these arguments.

As noted previously, the parties stipulated that Woodhaven was the only condominium complex in Waterbury with sales in 1980. Therefore, the defendant assessor used it as the comparable to determine the values of the Lakewood units. At trial, the plaintiffs offered into evidence two prior judgments involving the Woodhaven units, either of which the plaintiffs assert may be used to collaterally estop the defendants from relitigating the issue of the value of Woodhaven units. In the first, the 1983 decision, the court established the fair market value of $29,714 for a certain Woodhaven unit. In the second, the 1995 stipulated judgment, the parties stipulated to assessed values of $12,000 and $11,000 for certain Woodhaven units. We consider in turn the applicability of each prior judgment to the present appeal.

A

We consider first the 1983 decision. Although the plaintiffs relied primarily on the 1995 stipulated judgment at trial, on appeal, the plaintiffs rely also on the 1983 decision. As noted, the 1983 decision established the fair market value of $29,714 for a certain Woodhaven unit which, even taking into consideration the difference between fair market values and assessed values, differs significantly from the *assessed* values of $12,000 and $11,000 placed upon the Woodhaven units in the 1995 stipulated judgment. The defendants argue that the contradictory nature of these two judgments demonstrates their unreliability in determining the values of Woodhaven units for the purpose of establishing the value of the Lakewood units. In contrast, the plaintiffs contend that this disparity affects merely the degree of relief to which the plaintiffs are entitled, not whether they are entitled to relief in the first instance. Accordingly, they claim that the defendant assessor was required to apply the value of the Woodhaven unit found in the 1983 decision and that, therefore, we should

remand the case to the trial court with direction to apply that value. Essentially, the plaintiffs argue that collateral estoppel precludes the defendants from relitigating the issue of the value of the Woodhaven units.

"It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. Practice Book § 60-5; *Yale University* v. *Blumenthal*, 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (issue not reviewed because not raised at trial). This court will review claims not raised at trial only in extraordinary circumstances. See *Williamson* v. *Commissioner of Transportation*, 209 Conn. 310, 317, 551 A.2d 704 (1988). [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court. Practice Book § 4185, [now § 60-5] (court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims neither addressed nor decided by trial court are not properly before appellate tribunal) . . . ." (Citations omitted; internal quotation marks omitted.) *W.* v. *W.*, 248 Conn. 487, 505–506, 728 A.2d 1076 (1999), quoting *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998).

Although the 1983 decision was admitted into evidence at trial, the plaintiffs relied primarily upon the values found in the 1995 stipulated judgment. The only reference to collateral estoppel by the plaintiffs' counsel at trial, made during the *defendants'* direct examination of Robert Ghent, was with respect to that judgment, not the 1983 decision. In fact, when the court asked the plaintiffs' counsel whether the plaintiffs were urging the court "to take [the 1983 decision] as a precedent for [its] decision," the plaintiffs' counsel responded, "No, Your Honor." Moreover, nowhere does the trial

court's memorandum of decision mention the 1983 decision. The foregoing demonstrates that the plaintiffs' collateral estoppel claim based upon the 1983 decision was not distinctly raised or decided at the trial level. We therefore decline to reach it.[21]

## B

We consider next the 1995 stipulated judgment, which was the result of a tax appeal in which the owners of several units in the Woodhaven complex challenged the 1980 assessments placed on their units. The plaintiffs in the present case claim that this stipulated judgment, which, by agreement of the parties, established the assessed values of the units at issue at $12,000 and $11,000, collaterally estops the defendant from relitigating the issue of the value of the Woodhaven units in 1980.

The defendants maintain that the 1995 stipulated judgment is, "in effect, a consent judgment in which issues were not actually litigated" and that the judgment "represents a true compromise of the parties, based upon what [one witness] described as a 'plethora of material.' " Moreover, the defendants assert that the key elements of the doctrine of collateral estoppel are not satisfied in this case, as there is no mutuality of parties between the present case and the case that resulted in the 1995 stipulated judgment, and, additionally, the Lakewood units at issue in this case were not at issue in the prior case.

---

[21] Moreover, the fact that the plaintiffs asserted their collateral estoppel argument with respect to the 1983 decision for the first time in their reply brief further demonstrates that this claim has not been properly preserved. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 48 n.42 ("[i]t is a well established principle that arguments cannot be raised for the first time in a reply brief" [internal quotation marks omitted]); *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997) (same); *State* v. *Hill*, 237 Conn. 81, 97–98 n.23, 675 A.2d 866 (1996) (same).

The trial court rejected the plaintiffs' collateral estoppel argument, noting that the plaintiffs had no personal interest in the condominium units at Woodhaven and the values of the plaintiffs' Lakewood units were not at issue in the prior judgments involving the Woodhaven units. The trial court stated that "the agreement of the owners of certain Woodhaven units and the [defendants] regarding the value of those Woodhaven units, which resolved litigation between those parties, is of little probative value to the court in determining the fair market value of the Lakewood units." Finally, the court deemed significant the fact that the defendant assessor did not have available to him, when he conducted the initial assessment of the Lakewood units in 1987, the values placed upon the Woodhaven units in the 1995 stipulated judgment. Accordingly, the trial court was not persuaded by the plaintiffs' collateral estoppel argument. We are similarly unpersuaded.

"Historically, the doctrine of collateral estoppel, or issue preclusion, required mutuality of the parties. The general rule of issue preclusion is that [w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the *parties*, whether on the same or a different claim. . . . 1 Restatement (Second), Judgments § 27 (1982). Under the mutuality rule, [p]arties who were not actually adverse to one another in a prior proceeding could not assert collateral estoppel against one another in a subsequent action. *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 300, 596 A.2d 414 (1991).

"The mutuality requirement has, however, been widely abandoned as an ironclad rule. See id. We have held that the [mutuality] rule will no longer operate automatically to bar the use of collateral estoppel; id., 303; *but we also have recognized that circumstances*

*may exist in which lack of mutuality would render application of collateral estoppel unfair.* Id. This view is reflected in the Restatement (Second) of Judgments, which includes the mutuality rule within the general rule describing collateral estoppel; 1 Restatement (Second), supra, § 27; but also includes a section that describes a rule of nonmutuality and sets forth a number of factors to be considered in determining whether to follow the nonmutuality rule. [Id.], § 29." (Emphasis altered; internal quotation marks omitted.) *Labbe* v. *Pension Commission*, 239 Conn. 168, 186–87, 682 A.2d 490 (1996).

Section 29 of the Restatement (Second) of Judgments, which addresses "[i]ssue preclusion in subsequent litigation with others," provides that "[a] party precluded from relitigating an issue with an opposing party . . . is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action *or other circumstances justify affording him an opportunity to relitigate the issue.*" (Emphasis added.) This section lists the circumstances to which consideration should be given in determining whether to allow a party to relitigate an issue. Two such factors are relevant to this appeal.

Subsection (4) of § 29 provides that a factor to consider is whether "[t]he determination relied on as preclusive was itself inconsistent with another determination of the same issue." As noted previously, the 1983 decision and the 1995 stipulated judgment are inconsistent as to the values placed upon the Woodhaven units by the respective trial courts.

Additionally, subsection (5) of § 29 provides that another factor appropriately to be considered is whether "[t]he prior determination may have been affected by relationships among the parties to the first

action that are not present in the subsequent action, or apparently was based on a compromise verdict or finding." At trial, the defendants called as a witness Robert Ghent, the son of Donald Ghent and the brother of Donald Ghent, Jr., the owners of several Woodhaven units that were at issue in the appeals that resulted in the 1983 decision and the 1995 stipulated judgment. Robert Ghent has represented his family members as an attorney in tax appeals, including the appeal that resulted in the 1995 stipulated judgment.

Robert Ghent testified that among the factors that led to the 1995 stipulated judgment were the 1983 decision and the fact that the city had not granted Donald Ghent, Jr., relief based upon that decision. Additionally, the parties considered the sales-assessment statistics of the office of policy and management. Finally, it is significant that, according to Robert Ghent's testimony, the parties in the 1995 action stipulated to the values of the Woodhaven units at issue without preparing any appraisals of the subject properties. Therefore, the parties reached their agreement as to the values of the units based upon factors not relevant to the present appeal, without the aid of appraisals of the specific properties at issue.

Returning to subsection (5) of § 29 of the Restatement (Second) of Judgments, we are persuaded that the "prior determination [was] affected by relationships among the parties to the first action that are not present in the subsequent action, [and the judgment] was based on a compromise verdict or finding." In the present case, therefore, subsection (5) militates in favor of relying on the principles underlying the rule requiring mutuality, and, consequently, allowing the defendants to relitigate the issue of the values of the Woodhaven units. As discussed herein, subsection (4) also supports this conclusion.

Finally, the plaintiffs claim that, "[c]ollateral estoppel aside," the trial court acted improperly when it found the 1995 stipulated judgment to be of little probative value. The plaintiffs note that § 12-117a provides that "[t]he court shall have the power to grant such relief as to justice and equity appertains . . . ." According to the plaintiffs, "[j]ustice and equity required the trial court to look seriously at [the 1995 stipulated judgment]. It did not." A reading of the trial court's memorandum of law sets forth the court's reasoning and belies the plaintiffs' argument. It is clear that the trial court did, in fact, consider the 1995 stipulated judgment before determining that it was of little probative value.

In light of the foregoing, we cannot say that, as a matter of law, the trial court acted improperly in concluding that, under the doctrine of collateral estoppel, the 1995 stipulated judgment did not establish conclusively the values of the Woodhaven units for the purposes of the present appeal.

The judgment is affirmed.

In this opinion the other justices concurred.