[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is a real estate tax appeal from the action of the Wethersfield Board of Assessment Appeals. The plaintiff, Wethersfield Technology Group, LLC ("Wethersfield Technology"), claims that its property located on Progress Drive in Wethersfield was overvalued on the grand list of October 1, 1996 and thereafter.
The subject property consists of lots 1, 2, 3, and 4 in a six lot subdivision known as "Wethersfield Industrial Park." Lots 1, CT Page 2690 2, 3, and 4 are all vacant and each contains approximately two acres of land. Lot two also includes 13.49 acres of open space. The property is located in an Industrial Park (IP) zone. The industrial park is located on the north side of Wells Road (Connecticut Route 75) near its intersection with the Berlin Turnpike (Connecticut Route 15), which is a major state highway.
The six lot tract of land was originally acquired by Mangiafico Development Corporation from Rosario Mangiafico by deed dated May 17, 1988. The Wethersfield Planning and Zoning Commission approved a six lot subdivision of the property with a single road known as Progress Drive running north from Wells Road and ending in a cul-de-sac. As of the date of this hearing, Progress Drive has not been accepted by the town of Wethersfield as a town road because certain conditions attached to the zoning approval have not been completed. Approximately $160,000 of town required improvements have not been made. In addition, since Progress Drive intersects with Wells Road, a state highway, certain state improvement requirements amounting to approximately $150,000 have not been completed. On August 28, 1995, Mangiafico Development Corporation conveyed lots five and six of the Wethersfield Industrial Park to Capitol Region Education Council for $102,319 per acre. The Capitol Region Education Council is a governmental agency that operates a school for the hearing impaired on lots five and six.
Aurora Credit Services, Inc. obtained the remaining four lots by foreclosure on January 8, 1997. Wethersfield Technology purchased the four lots on April 15, 1997 for a stated consideration of $50,000. Lots 1, 2, 3, 4, and the 13.49 acre conservation area total 21.758 acres of land.
The last town wide revaluation was on October 1, 1989. All parties agree that the issue is the fair market value of the four lots as of October 1, 1989. The plaintiff has appealed the assessor's valuation of the subject property starting on the grand list of October 1, 1996. The plaintiff alleges that it appealed the assessor's valuation to the board of assessment appeals, and on March 25, 1997, the board made the following reductions:
1995 Fair Board's 1995 Board's 19951995 Assmt Mkt Value Reduced Assmt Reduced Fair Mkt Value[1]
Lot 1: $299,300 $427,500 $269,400 $384,857 CT Page 2691 Lot 2: $313,400 $447,800 $282,200 $403,142 Lot 3: $335,200 $478,800 $301,600 $430,857 Lot 4: $286,400 $409,100 $257,700 $368,142
$1,234,300 $1,763,200 $1,110,900 $1,587,000 (rounded)
Based upon the reductions made by the board of assessment appeals in 1995, the value of the property on the October 1, 1996 grand list was $1,587,000. The town's appraiser, Robert Flanagan, determined that the value of the property as of October 1, 1989 was $1,452,000. The plaintiffs appraiser, John LoMonte, determined that the value of the property as of October 1, 1989 was $365,000.
We note that the assessor's street cards (See Plaintiffs Exhibit A, Addenda, Defendant's Exhibit 3, Addendum) listed the total fair market value of the four subject lots at $925,000 as of October 1, 1989. The street cards show that the board of tax review reduced this value to $804,856 in 1991. Beginning on the grand list of October 1, 1995, the fair market value is shown on the street cards as $1,763,200, which was reduced by the board of assessment appeals to $1,587,000, as shown in the chart above. The reason for the discrepancy between what the assessor has for a fair market value of the subject as of October 1, 1989, and what the assessor's street cards now show, is the assessor's increase in the value placed on the property in 1995, based upon the paving of Progress Drive. The assessor's street cards show the following:
Lot 1, original valuation $225,000 as of October 1, 1989, reduced to $195,000 by the board of tax review in 1991. The valuation was increased by the assessor in 1995 to $427,500.
Lot 2, original valuation $246,300 as of October 1, 1989, reduced to $214,571 by the board of tax review in 1991. The valuation was increased in 1995 to $447,714.
Lot 3, original valuation $252,000 as of October 1, 1989, reduced to $218,428 by the board of tax review in 1991. The valuation was increased in 1995 to $478,800.
Lot 4, original valuation $202,000 as of October 1, 1989, reduced to $176,857 by the board of tax review in 1991. The valuation was increased in 1995 to $409,100. CT Page 2692
The appraisers for both parties appraised the subject four lots as of October 1, 1989. No mention was made by either party or their appraisers of the change in valuation by the assessor in 1995, which was based upon the paving of Progress Drive in 1995. Although an assessor may make an interim change in the assessment of property, 84 Century Limited Partnership v. Board of TaxReview, 207 Conn. 250, 262-63, 541 A.2d 478 (1988), we find no factual justification for the assessor increasing the value of the subject four lots in 1995 by approximately 90%. The assessor's increase appears to be based only on the paving of Progress Drive, when Progress Drive was not an accepted town road and substantial improvements were still required by the town and the state. The action of the assessor in increasing the assessment in 1995 was not done to correct an error as contemplated in General Statutes § 12-60, nor made because of new real estate construction on the property as contemplated in General Statutes § 12-53a. Since the 1995 action of the assessor was not raised by the parties or the appraisers during the course of this hearing, there is no evidence for us to consider regarding this interim assessment other than what we find on the assessor's street cards.
To add to the confusion in this case, the appraisal report dated June 20, 1997 by the plaintiffs appraiser, John LoMonte, bears marked similarities to another appraiser's report dated March 12, 1997. The other appraisal report, by O, R L Appraisal and Consulting ("O, R L") was made for a different client than the plaintiff. In that appraisal, O, R L determined that the fair market value of the property was $387,000. O, R L's appraisal was introduced by the town for the purpose of attacking the credibility of LoMonte. However, even though the town introduced O, R L's appraisal report for that purpose, it is a full exhibit, and provides the court with additional evidence supporting a much lower value than that placed upon the property by the town. Thus, we are faced with the unique situation of considering evidence presented by the town that shows a value much lower than that of the board of assessment appeals or the town's own appraiser.
A tax appeal is not an administrative appeal where our courts review the actions of the assessor. See Kimberly-Clark Corp. v.Dubno, 204 Conn. 137, 144-45, 527 A.2d 679 (1987). The function of the trial court in any municipal tax appeal is to first determine whether the subject property was overvalued, and if it was overvalued, what was the fair market value of the property on CT Page 2693 the date of the last revaluation. Konover v. Town of WestHartford, 242 Conn. 727, 734-36, 699 A.2d 158 (1997). Although it is the plaintiff taxpayer's burden to prove that it was aggrieved because its property was overvalued; see Executive Square Ltd.Partnership v. Wethersfield, 11 Conn. App. 566, 571, 528 A.2d 409
(1987); we have before us the O, R D appraisal report introduced by the town, as well as the valuation determination by the town's own appraiser of $1,452,000, which is $135,000 less than the value placed on the property by the town. We cannot ignore this evidence even though it comes from the town rather than the plaintiff. Powell v. Town of Andover, Superior Court, Judicial District of Tolland, Docket No. CV 95-0057903 (August 16, 1999), p. 7. When evidence is introduced in a de novo trial, the evidence does not belong to one side or the other, but rather it is there for the court to determine what credibility should be given to it and what relevancy it has to the issue to be decided. In determining value, we are "free to accept or reject, in whole or in part' expert testimony by either party, and [we have] the right to accept so much of the testimony of the experts" as we find relevant. Bridge Street Associates v. Water PollutionControl Authority, 15 Conn. App. 140, 148, 543 A.2d 1351 (1988);Metropolitan District v. Town of Burlington, 241 Conn. 382, 396,696 A.2d 969 (1997). Since the town's own appraiser has valued the subject property $135,000 less that the town's valuation, we conclude that the plaintiff has met its initial burden of showing that it is aggrieved by the action of the board of assessment appeals. Konover v. Town of West Hartford, supra, 242 Conn. 741.
One of the governing tenets in tax appeals is that the appeal is tried de novo and the ultimate question is what is the true and actual value of the subject property. Torres v. Waterbury, supra, 249 Conn. 117. This value is arrived at by "weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and [our] own general knowledge of the elements going to establish value." Id., 118. As we have previously noted, the assessor found the fair market value of the subject property on: October 1, 1989 to be $925,300 for the four lots. For the grand list of October 1, 1995, the assessor increased the fair market value of the four lots to a total of $1,763,200, a 90% increase in value. The O, R L appraisal report, introduced by the town to impeach the credibility of LoMonte, finds the total fair market of the four lots to be $387,000. LoMonte's appraisal report, which is a mirror copy of the O, R L appraisal, finds the total fair market value of the four lots to be $365,000. O, R L appraised CT Page 2694 each individual lot as follows: Lot 1, $130,000, Lot 2, ($47,000), Lot 3, $146,000, and Lot 4, $158,000. The reason for the negative value on Lot 2 was the appraiser's determination that there were liens placed on Lot 2 placed by the town that exceeded the value of the lot.
Joseph Santaniello, Executive Director of the State Traffic Commission ("commission") testified that the commission originally issued a certificate of approval to Mangiafico Development Corporation to make certain physical improvements to the subject subdivision before the lots could be developed. This certificate was issued in July of 1992 for one year. The certificate expired on July 2, 1993, without fulfillment of the conditions of the certificate. No new certificate has been issued since that time. A new certificate may be issued in the future, but this new certificate will encompass all six lots, not just lots 1, 2, 3, and 4. Without obtaining the certificate of approval from the commission, no building certificate may be obtained for any improvements on the subject lots. The school for the hearing impaired did not receive an approval from the commission. The school was issued a building permit without the approval of the commission. Some of the conditions which are required by the commission before approval to build on the lots can be given are additional widening of roads, and the installation of turn lanes. As we have previously stated, the approximate cost of the state required improvements is $150,000 and the road improvements required by the town as part of the subdivision approval, which have not been completed, amount to approximately $160,000.
The town's appraiser, Robert J. Flanagan, was of the opinion that, as of October 1, 1989, the subject property had a fair market value of $1,452,000. Flanagan considered the highest and best use of the subject property to be for an office-research type development. The O, R L appraisal report, introduced by the town to challenge the credibility of plaintiffs appraiser, found the highest and best use of the subject property to be for development as commercial lots. Flanagan selected lots 5 and 6 of the subject subdivision used as a school and a parcel in Newington used as a nursery school as the two comparables he relied on to develop a value for the subject four lots. Flanagan was of the opinion that the use of the existing lots in the subject subdivision for industrial use would be an inappropriate use since land in Wethersfield is too expensive to use for this purpose. Although Flanagan's opinion of the highest and best use CT Page 2695 was office-research development, he selected the school and a nursery school as comparables, stating that they were like office uses. As stated above, the school on lots five and six of the subdivision was not a permitted use in the IP zone, and did not have the required certifications. We disagree with the selection of theses sales as credible comparable sales.
The appraisal report of O, R L relies on four comparable sales, all located in industrial zones in Glastonbury, South Windsor, Newington and Cromwell. We find that the comparable sale used by O, R L, at 129 Krieger Lane in Glastonbury, along with the analysis of twelve other Glastonbury sales of one to two acre lots averaging $142,548 per acre, to be the most credible data for determining the value of the subject property. We find that the highest and best use of the property is for development as industrial or office use in conformance with the Wethersfield zoning regulations. We find the Glastonbury market to be fairly representative of the market for industrial/office lots in Wethersfield in 1989. Since we do not have any credible. evidence before us regarding sales of industrial/office lots in Wethersfield at the time of the 1989 revaluation, we consider the average price per acre of the sale of the lots in Glastonbury at and average of $142,548 per acre to be a fair representation of the value of the lots in Wethersfield on October 1, 1989.
Accordingly, we find the value of the four lots in the subject industrial park to have the following fair market values as of October 1, 1989:
Lot 1: 2.0 acres $285,096
Lot 2: 2.01 acres $286,521
Lot 3: 2.24 acres $319,307
Lot 4: 2.02 acres $287,946
$1,178,870
We recognize that there was no evidence that the sales of the lots in Glastonbury were made with any limitations such as those affecting the sale of the subject lots. In our view, the cost of complying with the state and town requirements, a total of approximately $310,000, must be borne by all six lots. We have therefore apportioned the cost per lot by dividing $310,000 by CT Page 2696 six to equal $51,667 per lot. Since the costs to comply with state and local requirements for the four subject lots is $206,668, we deduct this amount from $1,178,870 to arrive at a final valuation of the subject property at $972,202.
Accordingly, we find the fair market value of the subject property on the list of October 1, 1989 to be $972,202. Judgment may enter in favor of the plaintiff sustaining its appeal without cost to either party. The assessor shall reduce the assessment in accordance with this decision beginning on the October 1, 1996 grand list.
Arnold W. Aronson, Judge Trial Referee.