WILLIAM A. OLSON *v.* ACCESSORY CONTROLS AND EQUIPMENT CORPORATION ET AL.
(SC 16218)

Borden, Norcott, Katz, Palmer and Sullivan, Js.

Argued June 2—officially released August 8, 2000

*Alan I. Scheer*, with whom was *Julie A. Morgan*, for the appellant (plaintiff).

*Richard D. O'Connor*, with whom were *Glenn A. Duhl* and, on the brief, *Edward F. O'Donnell* and *George J. Kelly, Jr.*, for the appellee (named defendant).

*Opinion*

KATZ, J. This certified appeal raises two principal issues. First, we must determine the extent to which the attorney-client privilege applies to communications between counsel for a company and an environmental consulting firm retained by counsel to assist in responding to an order issued by the department of environmental protection. Second, we must determine whether, if privileged, the communications fall within the crime-fraud exception to the attorney-client privilege. The plaintiff, William Olson, appeals from the judgment of the Appellate Court affirming the judgment of dismissal by the trial court following the trial court's grant of a protective order and motion in limine barring the use of communications between the expert environmental consulting firm retained by an attorney for the named defendant, Accessory Controls and Equipment Corporation, and that attorney.[1] The plaintiff contends that: (1) the Appellate Court improperly determined that the communications in question were privileged; and (2) even if the communications were privileged, the Appellate Court improperly failed to apply the crime-fraud exception.

We conclude that the Appellate Court properly affirmed the trial court's application of the attorney-

---

[1] A judgment of dismissal was rendered in favor of the other defendant in this case, Teleflex Lionel-DuPont S.A., which is not involved in this appeal. References herein to the defendant are to Accessory Controls and Equipment Corporation.

client privilege to the communications at issue in this case. We conclude further, as a matter of first impression, that communications otherwise covered by the attorney-client privilege lose their protected status when they are procured with the intent of furthering a civil fraud. Under the facts of this case, however, we conclude that the plaintiff did not meet his burden of establishing that the exception applies. Accordingly, we affirm the judgment of the Appellate Court.

The record discloses the following relevant facts. In December, 1981, the plaintiff was employed by the defendant as an engineering technician in the defendant's Windsor plant. The defendant manufactured, among other products, air conditioning equipment, jet air starters and ground power units for airplanes. By 1985, the plaintiff, who had been promoted to plant manager, was responsible for the manufacturing operations. The plaintiff held this position at all times relevant to the present case.

On October 11, 1989, the state department of environmental protection (department) conducted an on-site inspection of the defendant's Windsor plant. The department documented its findings in an inspection report that identified two areas of concern regarding hazardous waste discharge and storage activity. First, the inspection report noted bulges in an outside storage drum that contained potentially hazardous waste.[2] Second, the inspection report documented that outdoor paint booth vents aimed at the ground were causing residue buildup and soil contamination.

On January 30, 1990, the department issued an order to the defendant requesting information and a remedial plan concerning the storage, disposal and removal of

---

[2] The inspection report also noted that the defendant's operation might be considered a storage facility because it had been storing waste for more than ninety days.

hazardous waste at the plant. That order did not specifically identify the two areas of concern documented in the inspection report. Instead, the order reflected a broad mandate to: "1. Bring all waste handling procedures and facilities into compliance with Connecticut's Hazardous Waste Management Regulations. 2. Effect the removal and proper disposal of all toxic, hazardous, and other industrial wastes now improperly stored on-site in a manner approved by the Commissioner of Environmental Protection. 3. Investigate the degree and extent of groundwater, surface water, and soil contamination resulting from chemical and waste storage, handling and disposal activities at the [Windsor] site. 4. Take the necessary remedial actions to eliminate or minimize the contamination resulting from such activities."

Accompanying the order was a notification letter, also dated January 30, 1990, addressed to the defendant's president indicating that Christie Wopschall-Flowers, a department staff member, would serve as the contact person to handle any questions regarding the order. After receiving the order and notification letter, the defendant engaged Carole W. Briggs, an attorney, to provide it with legal advice on how to proceed. In turn, Briggs hired Environmental Management and Compliance Corporation (Environmental Management), and its subcontractor, Soils Engineering Services, Inc. (Soils Engineering), to perform confidential services in anticipation of possible litigation between the defendant and the department. In particular, Environmental Management was hired to conduct an investigation and to provide the defendant and Briggs with information gathered from its examination of the plant property. Briggs also initiated correspondence with Wopschall-Flowers to determine an acceptable course of action to facilitate compliance.

Briggs retained Environmental Management on or about February 27, 1990. As found by the trial court, the engagement letter soliciting the services of Environmental Management was "replete with admonitions that all communications with respect to the [Environmental Management] employment between the president of [Environmental Management] and his office and with the law firm representing [the defendant] and between [Environmental Management] and any attorney, agent or employee acting for [the defendant] are to be confidential and made solely so that counsel for [the defendant] can give [the defendant] legal advice." In addition, the engagement letter, signed and acknowledged by Environmental Management's president, indicated that all papers prepared by Environmental Management would become the property of counsel for the defendant.

Briggs met with Wopschall-Flowers on or about March 28, 1990, to discuss both the October, 1989 inspection report and the January, 1990 order, in an effort to devise an agreeable course of action regarding the defendant's voluntary compliance with the department's request. On or about June 7, 1990, Environmental Management and Soils Engineering issued a preliminary report to Briggs and the defendant concerning waste contamination at the Windsor plant. A copy of that report, which is referred to by the parties as the Diaz report, was sent to the plaintiff in his capacity as plant manager. The Diaz report also contained information about areas of the plant that had not been identified in the department's inspection report. Briggs then identified, for the defendant and Environmental Management, those portions of the Diaz report that were not responsive to the department's inquiry.

On June 22, 1990, Briggs sent Environmental Management a letter (Briggs notice) instructing it to stop working because of its refusal to tender separate reports regarding the different areas of the plant. The Briggs

notice also reflected Briggs' position that the Diaz report should not be released to the department in its entirety. Thereafter, the defendant retained another environmental consulting firm, Environmental Laboratories, Inc. (Environmental Laboratories), to conduct a second evaluation of the Windsor plant. In compliance with the original order, the defendant then submitted that report to the department. The June 7, 1990 Diaz report was never submitted to the department.

As stated by the Appellate Court, "[t]hereafter, and according to the plaintiff's complaint, the defendant [Teleflex Lionel-DuPont S.A. (Teleflex)], a French corporation, acquired an ownership interest in [the defendant]. In February, 1992, Teleflex' representatives, Francois Calvarin and Alex Reese, visited the Windsor plant as part of a postacquisition review of [the defendant's] operations. While there, Calvarin and Reese questioned the plaintiff about [the defendant's] prior practices with regard to the storage and disposal of toxic and hazardous waste at the plant. Calvarin and Reese encouraged the plaintiff to cooperate with their investigation by promising the plaintiff that his communications with them would be confidential and would not be shared with [the defendant's] management. They further assured him that his communications with them would not be the subject of reprisal or other negative employment action.

"Relying on Calvarin and Reese's assurances, the plaintiff disclosed to them that there had, in fact, been improper storage and disposal of toxic and hazardous waste at the Windsor plant. The plaintiff further advised them of the existence of the June 7, 1990 Diaz report submitted to [the defendant] by Environmental Management and Soils Engineering. The plaintiff asserts that despite their assurances, Calvarin and Reese communicated to senior management [of the defendant] the information that the plaintiff had provided them.

"According to the plaintiff, upon learning of his disclosures to Calvarin and Reese, [the defendant] commenced a campaign of retaliation against the plaintiff with the apparent goal of forcing him to resign or, in the alternative, to provide [the defendant] with a justification for dismissing him. On February 12, 1993, following the unsuccessful campaign to force him to resign, [the defendant] dismissed the plaintiff under the pretext that his position had been eliminated." *Olson* v. *Accessory Controls & Equipment Corp.*, 54 Conn. App. 506, 510–11, 735 A.2d 881 (1999).

Following his termination, the plaintiff commenced this action against the defendant and Teleflex, alleging that his dismissal constituted wrongful termination and retaliatory discharge. In particular, the plaintiff claimed that he had been discharged for having reported to Teleflex representatives potential violations of the state environmental laws and regulations governing waste storage and disposal at the defendant's plant.[3]

Before trial, pursuant to Practice Book § 221, now § 13-5,[4] the defendant moved for a protective order seek-

[3] The plaintiff also brought an action against Teleflex directly, alleging that Calvarin and Reese had reported the plaintiff's comments to his superiors at the defendant's premises after assuring him of the confidentiality of his remarks. The plaintiff contended that his conversations with Calvarin and Reese were confidential and that their assurances that his comments would be held in confidence constituted negligent misrepresentation. Teleflex moved to dismiss the plaintiff's claim on jurisdictional grounds, arguing that, as a French corporation with virtually no ties to the state, the Connecticut court lacked personal jurisdiction over the foreign entity. See *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 54 Conn. App. 506. The trial court granted the motion. That judgment of dismissal is not the subject of this appeal. See footnote 5 of this opinion.

[4] Practice Book § 13-5 provides in relevant part that "[u]pon motion by a party from whom discovery is sought, and for good cause shown, the judicial authority may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had . . . ."

ing to preclude the plaintiff and his attorneys from disclosing, inter alia, oral and written communications that had occurred between the defendant and Briggs, which the defendant claimed had been made for the purpose of conveying legal advice. The defendant also sought the return from the plaintiff of all documents containing such communications. The trial court granted the defendant's motion for a protective order concluding that the documents were protected by the attorney-client privilege and that the crime-fraud exception was not applicable under the facts of the case.

The defendant then filed a motion in limine, asking the trial court to adopt the earlier protective order and to exclude from trial any information previously found to be protected by the attorney-client privilege. In granting the defendant's motion, the trial court adopted the factual findings contained in the earlier protective order and prohibited any use of, or reference to, the Diaz report, the Briggs notice, or the information contained therein. The defendant then moved to dismiss the action, claiming that, in light of the trial court's evidentiary ruling to exclude from disclosure the information contained in the protective order, the plaintiff would be unable to present a prima facie case. The plaintiff joined in the defendant's motion. The trial court granted the defendant's motion, and rendered judgment dismissing the plaintiff's complaint.

On appeal to the Appellate Court, the plaintiff claimed, inter alia, that the trial court improperly: (1) granted the defendant's motion for a protective order, based on the attorney-client privilege; (2) granted the defendant's motion in limine; and (3) granted the defendant's motion to dismiss.[5]

[5] The plaintiff also claimed that the trial court had improperly granted Teleflex' motion to dismiss. See *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 54 Conn. App. 508. The Appellate Court affirmed that judgment of dismissal. Id., 518. The plaintiff has not challenged the propriety of that judgment on appeal to this court.

The Appellate Court concluded that the communications between Briggs and Environmental Management had been "made in confidence for the purpose of seeking legal advice"; (internal quotation marks omitted) *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 54 Conn. App. 524, quoting *State* v. *Gordon*, 197 Conn. 413, 423, 504 A.2d 1020 (1985); and accordingly, were covered by the attorney-client privilege, "despite the fact that Briggs was hired by, and a representative of, [the defendant], itself a corporate entity, and despite the fact that the communication was not made by the client itself to the attorney." *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 520. This conclusion was predicated on certain facts found by the trial court, including, but not limited to, that Briggs had hired Environmental Management to conduct studies that would assist her in preparing for possible litigation with the regulatory authorities, and that the Diaz report and the Briggs notice related to the legal advice that the defendant had sought. The Appellate Court declined to reach the issue of whether the communications at issue fell within the fraud exception to the attorney-client privilege, noting only that the so called crime-fraud exception[6] has been recognized in Connecticut as applicable only where the communication at issue involved commission of a crime, rather than merely civil fraud. Id., 524 n.6. The Appellate Court indicated, however, that, even if the attorney-client privilege could be abrogated through use of the fraud component of the crime-fraud exception, the findings of the trial court did not support its application. Id. Accordingly, the Appellate Court affirmed the trial court's decision to grant the defen-

---

[6] This exception to the attorney-client privilege is commonly referred to as the "crime-fraud exception," because, phrased in the disjunctive, it permits the party opposing the privilege to pierce it when the communications at issue were made with the intent to further either a criminal or a fraudulent purpose. See *United States* v. *Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989); see also part II of this opinion.

dant's motion for a protective order, motion in limine, and subsequent motion to dismiss. Id., 526, 529.

We granted certification limited to the following question: "In the circumstances of this case, did the Appellate Court properly conclude that the trial court properly had determined that certain communications between counsel for the defendant and an expert consulting firm retained by the defendant were covered by the attorney-client privilege?" *Olson* v. *Accessory Controls & Equipment Corp.*, 251 Conn. 917, 740 A.2d 864 (1999). This appeal followed.

We conclude that the attorney-client privilege covers the communications at issue in this case. We conclude further that, under the crime-fraud exception, otherwise privileged communications may be stripped of their privileged status if the communications have been procured with the intent to further a civil fraud. Finally, we conclude that, under the circumstances of this case, the plaintiff has failed to meet the requisite burden to establish the applicability of that exception. We therefore affirm the judgment of the Appellate Court. Additional facts will be provided as necessary.

I

The plaintiff first contends that the Appellate Court improperly affirmed the trial court's conclusion that the Diaz report and the Briggs notice were documents that had been generated for the purpose of enabling Briggs to provide the defendant with legal advice, and that they were therefore covered by the attorney-client privilege. We disagree with the plaintiff's contention. Before we assess the plaintiff's claims, however, we undertake a brief review of the pertinent legal principles.

A

At the outset, we recite the standard governing the review of a trial court's decision on a discovery motion.

We have long recognized that "the granting or denial of a discovery request rests in the sound discretion of the [trial] court," and is subject to reversal "only if such an order constitutes an abuse of that discretion." (Internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 51, 730 A.2d 51 (1999). "[I]t is only in rare instances that the trial court's decision will be disturbed." (Internal quotation marks omitted.) *Simmons* v. *Simmons*, 244 Conn. 158, 175, 708 A.2d 949 (1998). Therefore, we must discern "whether the court could [have] reasonably conclude[d] as it did." (Internal quotation marks omitted.) Id.

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 118–19, 733 A.2d 817 (1999). Neither party has challenged the facts as found by the trial court. Thus, our limited task is to decide whether, based on these facts, the trial court's conclusions of law are legally and logically correct. See id., 118.

With these standards in mind, we address the issues before us. On numerous occasions we have reaffirmed the importance of the attorney-client privilege and have recognized the "long-standing, strong public policy of protecting attorney-client communications." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 249 Conn. 48; see also *Shew* v. *Freedom of Information Commission*, 245 Conn. 149, 157, 714 A.2d 664 (1998) (discussing "well established legal principles governing

communications between attorney and client"). "In Connecticut, the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 52. The privilege fosters " 'full and frank communications between attorneys and their clients and thereby promote[s] the broader public interests in the observation of law and [the] administration of justice.' " Id., 52, quoting *Upjohn Co.* v. *United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981).

As a general rule, "[c]ommunications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice." *State* v. *Gordon*, 197 Conn. 413, 423, 504 A.2d 1020 (1985). "A communication from attorney to client solely regarding a matter of fact would not ordinarily be privileged, unless it were shown to be inextricably linked to the giving of legal advice." *Ullmann* v. *State*, 230 Conn. 698, 713, 647 A.2d 324 (1994). Moreover, although we have acknowledged that "statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality"; *State* v. *Cascone*, 195 Conn. 183, 186, 487 A.2d 186 (1985); see also *State* v. *Colton*, 174 Conn. 135, 138–39, 384 A.2d 343 (1977); we have recognized that "[t]he presence of certain third parties . . . who are agents or employees of an attorney or client, and who are necessary to the consultation, will not destroy the confidential nature of the communications." *State* v. *Gordon*, supra, 424; *State* v. *Cascone*, supra, 186–87 n.3; accord *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 159 n.12 (" 'a person making a privileged communication to a lawyer for an organization must then be acting as agent of the principal-organization' ");

see also *State* v. *Toste*, 178 Conn. 626, 628, 424 A.2d 293 (1979) (privilege bars state from calling as witness psychiatric expert "retained by a criminal defendant or by his counsel for the sole purpose of aiding the accused and his counsel in the preparation of his defense"). Appropriately, the attorney-client privilege "extends to interpreters, and to clerks and agents employed by the attorney . . . in the business committed to his [or her] charge . . . ." *Goddard* v. *Gardner*, 28 Conn. 172, 175 (1859); see id., 175–76 (while recognizing privilege extends to certain court personnel and agents of attorney, court refused to extend privilege to protect communication overheard by attorney's son, where son was "in no way connected with the case or with the parties" and had "no interest in, or connection with, the professional business of the attorney"); see also *Pagano* v. *Ippoliti*, 245 Conn. 640, 650 n.12, 716 A.2d 848 (1998) (recognizing that statements made by agent on behalf of principal to principal's attorney may be protected by principal's attorney-client privilege).

## B

In the present case, the parties do not dispute that Environmental Management was hired by Briggs to assemble the Diaz report for the defendant for ultimate submittal to the department. Therefore, the issue of agency is uncontested. Our inquiry distills to whether the Diaz report was made in confidence, and whether the communications were " 'inextricably linked to the giving of legal advice' " so as to bring them within the attorney-client privilege. *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 162 (attorney-client privilege protects those communications necessary to obtain legal advice); *Ullmann* v. *State*, supra, 230 Conn. 713 (same); see also *Rienzo* v. *Santangelo*, 160 Conn. 391, 395, 279 A.2d 565 (1971) (attorney-client privilege encompasses confidential communications relating to

legal advice sought from legal professionals acting in that capacity).

The plaintiff contends that the department's order was a mandate to the defendant to submit a broad environmental audit of its entire Windsor facility. According to the plaintiff, the Diaz report was merely a response to the department's order and, therefore, it "was not created for the purpose of giving legal advice." The plaintiff concedes that Briggs' role as the defendant's attorney was "to provide [the defendant] with legal assistance in dealing with the facts," but argues that "creation of the facts," that is, compiling the facts concerning potential sources of contamination on the plant property in the Diaz report, "falls outside of the attorney-client privilege." The plaintiff urges that, because the Diaz report is a "nonlegal, technical report," mandated by the department, both it and the related Briggs notice cannot be privileged.

The defendant maintains that the department's order was negotiable and ultimately subject to appeal in the Superior Court. The defendant contends that it reserved the right to appeal the nonbinding order and that its purpose in soliciting the Diaz report and corresponding with the department was "in the nature of a voluntary effort to agree on a resolution" to the problems concerning the areas of contamination that the department had identified. The defendant argues that Briggs' sole purpose in engaging Environmental Management was to compile the Diaz report, and thus the only reason for the subsequent communications between Briggs and Environmental Management was to "enable counsel to advise [the defendant] on its legal responsibilities in responding to the administrative order." We agree with the defendant.

1

Drawing the line between technical, factual information that is necessary for legal advice and technical

information that is not essential to such advice requires a fact-specific inquiry. This is particularly true in the context of reports compiled by outside consultants.

In *United States* v. *Kovel*, 296 F.2d 918, 922 (2d Cir. 1961), the court addressed the extent to which confidential communications made by a client to an accountant, who had been hired by the client's tax attorney, were protected from disclosure before a grand jury. The accountant had been engaged to assist the attorney in rendering tax advice to the client. Id. In extending the attorney-client privilege to the communications, the court recognized that "the privilege must include all the persons who act as the attorney's agents" when the assistance of the agent is "indispensable" to the attorney's work. (Internal quotation marks omitted.) Id., 921. The court cautioned, however, that "[i]f what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." (Citations omitted.) Id., 922.

This standard has been employed in similar cases distinguishing "those independent outside services performed for an attorney that are discoverable, from those that are not." *Federal Trade Commission* v. *TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980). "[T]he attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client." Id., 212, citing *United States* v. *Kovel*, supra, 296 F.2d 918; see *Federal Trade Commission* v. *TRW, Inc.*, supra, 213 (report compiled by computer consultant at client's request not privileged as to Federal Trade Commission subpoena due to fact that court did not have "sufficient facts to state with reasonable certainty that the [attorney-client] privilege applie[d]"); see also *United States* v. *Cote*, 456 F.2d 142, 144 (8th Cir. 1972) (accountant's papers used by

attorney to advise client privileged because decision to file amended tax return "undoubtedly involved legal considerations").

Courts have been reluctant, however, to extend the privilege to reports compiled by third parties absent a clear indication that the information was submitted confidentially by an agent to the attorney for legal advice. For example, in *United Postal Service* v. *Phelps Dodge Refining Corp.*, 852 F. Sup. 156, 161 (E.D.N.Y. 1994), the court refused to apply the privilege to communications made by two environmental consultants to the defendants and their in-house counsel. The consultants had been retained to conduct environmental studies and to develop a remedial program for cleaning up the defendants' property in connection with a request from the New York state department of environmental conservation. Id., 159 n.1, 161. The court refused to extend the attorney-client privilege because "neither consultant [could] be considered an agent [of the attorney] encompassed by the privilege." Id., 161. The court noted that the consultants "were not employed by [the defendants'] attorneys specifically to assist them in rendering legal advice . . . [but] were hired by [the] defendants to formulate a remediation plan acceptable to the [state agency] and to oversee remedial work at the [p]roperty." Id. Although the court stated that "factual data can never be protected by the attorney-client privilege" because scientists and engineers rarely would be considered agents of the attorney, its ultimate conclusion rested on a review of the documents themselves. Id., 162. The court found that "none of the documents revealed any confidential communications by the defendants or their attorneys to the consultants," and concluded that the notations on the documents by the attorneys did not amount to legal advice. Id.

Similarly, in *In re Grand Jury Matter*, 147 F.R.D. 82 (E.D. Pa. 1992), the court denied a motion to quash a

subpoena duces tecum directed at documents that had been compiled by an expert environmental consultant for a company, and concluded that the attorney-client privilege did not apply. The company had asserted the privilege in the context of a federal criminal investigation for violations of waste handling and disposal statutes and maintained that the environmental reports had been prepared in connection with proceedings initiated by the Pennsylvania department of environmental resources. Id., 84. The court refused to apply the attorney-client privilege to the reports, and determined that "the documents [had been] made in the course of the expert consultant's provision of environmental services to the company, and not for the purpose of assisting the law firm in providing legal advice to the company." Id., 85. Although the expert had been paid with the company's funds through the law firm, the court concluded that the consultant had not been an agent or employee of the law firm. Id. Additionally, the court noted that extending the privilege was inapt because the consultant had met and corresponded with the state agency on several occasions without the law firm present. Id. Ultimately, the court concluded that the documents had been "made solely in the course of the expert consultant's preparation of a waste management plan that would achieve regulatory compliance for the company's waste disposal practices. That is, the documents were made in the course of the expert consultant's provision of environmental services to the company, and not for the purpose of assisting the law firm in providing legal advice to the company." Id.

These cases do not support a bright line rule that would deem all technical or factual reports compiled for eventual submittal to a governmental agency as outside the attorney-client privilege in all circumstances. Nevertheless, relying essentially on two cases, the plaintiff advocates for such a rule. First, he cites

to an unreported Superior Court decision for the notion that " '[t]echnical information, such as the results of research, tests and experiments, communicated to an attorney, is not protected by the attorney-client privilege unless such information is communicated . . . for legal opinion or interpretation.' " *Carrier Corp.* v. *Home Ins. Co.*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 352383 (August 18, 1992). We disagree with the plaintiff's interpretation of this statement. Indeed, stated alternatively, *Carrier Corp.* stands for the proposition that the privilege *may* attach to technical reports communicated to an attorney if done so "for legal opinion or interpretation." Id.

The plaintiff also cites *Hercules, Inc.* v. *Exxon Corp.*, 434 F. Sup. 136, 143 (D. Del. 1977), an action involving certain communications made while an attorney was preparing a patent application. Therein, the court noted that the scope of the attorney-client privilege can be determined only on a case-by-case basis, and that applying the privilege in the patent prosecution or enforcement area "raises some difficult line-drawing problems." Id., 144–45. The court in *Hercules, Inc.*, recognized that "[t]he fact that a communication contains technical information . . . does not automatically preclude application of the privilege. If the primary purpose of the document is to solicit legal advice based on that information, the privilege applies." Id., 148; see also *Federal Trade Commission* v. *TRW, Inc.*, supra, 628 F.2d 213 (refusing to apply attorney-client privilege to computer consultant's report because of "ambiguity" in record); *Cuno, Inc.* v. *Pall Corp.*, 121 F.R.D. 198, 204 (E.D.N.Y. 1988) ("[w]here a lawyer mixes legal and business advice the communication is not privileged unless 'the communication is designed to meet problems which can fairly be characterized as predominantly legal' "). Like *Carrier Corp.*, these cases resonate with our own approach, which is, to apply the privilege

where the communications at issue are "inextricably linked to the giving of legal advice . . . ." (Internal quotation marks omitted.) *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 162 (attorney-client privilege protects communications necessary to obtain legal advice); *Ullmann* v. *State*, supra, 230 Conn. 713 (same); see also *Rienzo* v. *Santangelo*, supra, 160 Conn. 395 (attorney-client privilege encompasses confidential communications relating to legal advice sought from legal professionals acting in that capacity).

2

In the present case, the trial court concluded that the Diaz report and the Briggs notice were covered by the privilege as communications necessary for legal advice. The trial court determined that the department's order was nonbinding and that it imposed no duty on the defendant to submit the entire Diaz report. We note that these conclusions were predicated on factual findings that the plaintiff has not challenged on appeal. See *Melillo* v. *New Haven*, 249 Conn. 138, 151, 732 A.2d 133 (1999) (trial court's findings binding unless challenged as clearly erroneous).

The record discloses the following additional facts upon which the trial court based its conclusions. Before Briggs had engaged Environmental Management, the defendant had requested a hearing before the commissioner by letter dated February 21, 1990. Briggs met with Wopschall-Flowers in March, 1990, to discuss the order, and subsequent correspondence between Briggs and the department indicated that the defendant was gauging "whether a hearing, consent order, settlement or other resolution of th[e] matter would be most appropriate."[7] Moreover, at various times throughout the dis-

---

[7] Although the trial court found that the defendant had requested a hearing before the commissioner of environmental protection, negotiations ensued, and our review of the record indicates that no hearing occurred.

cussions among the defendant, Briggs and the department, deadlines were extended by agreement and the order held in abeyance so as to facilitate a potential settlement. Accordingly, the trial court concluded that the order was not "self-operative," but, rather, that it was "a document that initiate[d] contact between the agency and a member of a regulated industry [and was] immediately upon issuance subject to negotiation."[8]

The trial court determined that Briggs had hired Environmental Management to conduct certain studies and to assemble a report so that she could utilize those facts in tendering legal environmental compliance advice to the defendant in anticipation of possible litigation with the department. In reaching this conclusion, the trial court relied, in part, on the engagement letter, which, as found by the trial court, contemplated strict confidentiality and indicated that Briggs needed the Diaz report in order to provide the appropriate legal advice to the defendant.

The plaintiff argues that we should ignore the engagement letter and examine only the factual nature of the report. We agree with the defendant, however, that the engagement letter indicates that Briggs and Environmental Management understood that the information

---

[8] In reaching this conclusion, the trial court referred to General Statutes § 22a-6 (e), which provides in relevant part that "[w]henever the commissioner issues an order to enforce any statute, regulation, permit or order administered or issued by him [or her], any person . . . aggrieved by such an order may . . . request a hearing before the commissioner within thirty days from the date such order is sent. . . ." The trial court also referenced General Statutes § 22a-437 (a), which governs appeals and provides in relevant part that "any person who . . . is aggrieved . . . by any order of the commissioner . . . to abate pollution may, after a hearing by the commissioner . . . appeal from the final determination of the commissioner based on such a hearing to the Superior Court . . . ." See *McManus* v. *Commissioner of Environmental Protection*, 229 Conn. 654, 662–63, 642 A.2d 1199 (1994) (recourse from administrative order under § 22a-6 [e] is hearing before officer who acts as both fact finder and decision maker; enforcing administrative order may require civil action).

gathered as part of the investigation of the plant property would be held in confidence. Additionally, the consultant, Briggs, and the defendant had acted consistently with their belief that the information was confidential. The letter, coupled with their conduct, reasonably provided the trial court with evidence that the purpose of the relationship between Briggs and Environmental Management had been to assist Briggs in rendering legal compliance advice to the defendant.

The trial court also found that, the broad language of the order notwithstanding, the department was concerned only with information and, ultimately, remediation, regarding the two sites specifically identified in the inspection report, rather than with information and remediation regarding the entire plant. It is uncontested, moreover, that Briggs, with the defendant's express authorization, engaged Environmental Management, and its subcontractor, Soils Engineering, to respond, not to the entire order, but only to the required investigation of soils and groundwater contamination—one of four directives listed on the order. The consultant was not hired to formulate a remedial plan acceptable to the department. Furthermore, at all times relevant to the creation and submission of the Diaz report to Briggs and the defendant, the report was referred to as "preliminary." Based on its review of Wopschall-Flowers' deposition, the inspection report and the notification letter, the trial court found that "what [the department] expected [was] that only the concerns reflected in the October [1989] inspection report would be addressed and there was no requirement that [the defendant] make an inspection of its whole plant site." The order itself was found by the trial court to be merely a "boiler plate form" that required reference to the October inspection report. Moreover, the court noted that the notification letter accompanying the abatement order "explicitly refer[red] to the October inspection"

report, and the court found that "the only compliance envisaged by the terms of the letter would be that compliance which would address the environmental problems brought to light during the prior October [department] inspection."

Finally, the department's own representative acknowledged that it was interested primarily in the two sites identified in the October inspection report. During the course of the Wopschall-Flowers deposition, the plaintiff's counsel queried whether "it [was] fair to say that the intent of [the department] when it issued this [January 30, 1990] order was not necessarily to limit the areas identified in the original inspection report in terms of the areas that [the department] expected or intended to have [the defendant] investigate?" Wopschall-Flowers responded that "[t]echnically speaking, we had . . . two areas of concern that we wanted them to investigate and that was our basis for including this [broadly worded] provision in the order. Whether or not we could have had them address any other areas, I'm not sure." Neither party has directed us to any statute or regulation imposing a broad duty to disclose areas of potential environmental hazards over and above those identified and singled out for remediation by the department in an on-site inspection. Thus, the trial court reasonably concluded that the order was limited in scope and that there was no need for the defendant to turn over to the department information regarding the additional areas of the plant.

On the basis of these facts, the trial court determined that Briggs had solicited the preliminary report from Environmental Management in order to assess her client's legal position and to render advice concerning the limited information that the department sought. The trial court recognized that, in the course of assessing the Diaz report from a legal, regulatory compliance standpoint, Briggs had made extensive comments and

suggestions on the document itself reflecting her legal opinion as to the sufficiency of the information. These comments also directly related to what the department required for compliance with the inspection report and order. See, e.g., *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) (applying privilege to confidential drafts of communications that, upon final completion, might be discoverable). As the Appellate Court noted, "the sole purpose of the relationship between [the defendant] and Briggs, and . . . between Briggs and Environmental Management, was to provide [the defendant] with legal advice on how to respond to the department order." *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 54 Conn. App. 520 n.5. In sum, the trial court reasonably found that the Diaz report was connected intimately to the rendering of legal advice, and hence, properly extended the attorney-client privilege to both the Diaz report and to the related Briggs notice.

## II

We next address the plaintiff's argument concerning the crime-fraud exception to the attorney-client privilege.[9] In essence, the plaintiff argues that Briggs and the defendant perpetrated a fraud on the department by misleading it and failing to submit the Diaz report, which revealed areas of potential contamination

---

[9] The plaintiff urges this court to address the applicability of both parts of the crime-fraud exception. That is, the plaintiff asserts that either the crime portion of that exception, which we have previously acknowledged; see *Supplee* v. *Hall*, 75 Conn. 17, 22–23, 52 A. 407 (1902); or the civil fraud portion, which we have not acknowledged before, would suffice to defeat the privilege. See footnote 6 of this opinion. Because the trial court determined that the plaintiff had argued only the civil fraud portion, we decline to address whether the facts here support the exception as it relates to criminal conduct. See *Ham* v. *Greene*, 248 Conn. 508, 531, 729 A.2d 740 (issues not properly raised before trial court ordinarily not considered on appeal), cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999).

beyond those areas targeted for remedial action.[10] The plaintiff urges us to recognize the civil fraud portion of the crime-fraud exception to the attorney-client privilege. We consider this a suitable case in which to adopt the fraud exception, as a matter of law, but conclude that it does not apply to the facts of this case.

## A

Before exploring the exception, we emphasize our limited task in reviewing this appeal. Given the unchallenged facts in the record, our sole concern is whether the trial court's conclusions of law are legally and logically correct. See *Torres* v. *Waterbury*, supra, 249 Conn. 118; see also *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163, 671 A.2d 813 (1996) (same).

---

[10] As a threshold matter, the defendant argues that we should not reach the issue due to the limited scope of the certified question before us. The defendant notes that the plaintiff petitioned this court to review the lower courts' decisions concerning the applicability of the privilege to the third party consultant, the applicability of the crime-fraud exception, and whether the documents at issue were protected as attorney work product. The defendant relies upon Practice Book § 84-9, which provides in relevant part that "[t]he issues which the appellant may present are limited to those raised in the petition for certification, except where the issues are further limited by the order granting certification." The defendant argues that the certified question in this case precludes any consideration of the "separate issue of the exception" to the attorney-client privilege. We denied the defendant's motion to strike those portions of the plaintiff's brief concerning the crime-fraud exception and the work product doctrine. The trial court explored fully the applicability of the exception and we view the issue of an exception to the attorney-client privilege as sufficiently related to the principal issue of whether the privilege applies. Finally, the defendant has had ample opportunity to respond to the plaintiff's assertion of the crime-fraud exception, has briefed fully the issue, and will suffer no prejudice from our consideration of the issue. Therefore, we address the applicability of the crime-fraud exception.

We decline, however, to address the separate issue of whether the attorney work product doctrine would apply. Neither the trial court nor the Appellate Court reached the issue. Further, in light of the conclusion reached in part I of this opinion, namely, that the attorney-client privilege extends to the Diaz report and the Briggs notice, we need not decide whether the communications also would be protected from disclosure under the attorney work product rule.

Although we have noted previously that the attorney-client privilege reflects a significant public policy, and that "[i]t is important not to weaken the privilege with various exceptions because . . . even the threat of disclosure would have a detrimental effect on attorneys' ability to advocate for their clients while preserving their ethical duty of confidentiality"; *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 249 Conn. 48–49; we also have recognized "that since the [attorney-client] privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157. Accordingly, "[e]xceptions to the attorney-client privilege should be made only when the reason for disclosure outweighs the potential chilling of essential communications." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 52.

"It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy . . . between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." (Citation omitted; internal quotation marks omitted.) *United States* v. *Zolin*, supra, 491 U.S. 563; *Clark* v. *United States*, 289 U.S. 1, 15, 53 S. Ct. 465, 77 L. Ed. 993 (1933) ("[a] client who consults an attorney for advice that will serve him [or her] in the commission of a fraud will have no help from the law"); *In re Grand Jury Proceedings*, 183 F.3d 71, 76–77 (1st Cir. 1999) ("we exclude from the privilege communications made in furtherance of crime or fraud because the costs to truth-seeking outweigh the justice-enhancing effects of complete and candid attorney-client conversations"); *United States* v. *Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) ("[t]he crime-fraud exception removes the privilege from those attorney-client communications that are

'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct'"); *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) ("[w]hile there is a societal interest in enabling clients to obtain complete and accurate legal advice . . . there is no such interest when the client consults the attorney to further the commission of a crime or fraud").

We previously have limited this exception by permitting its application only to situations wherein the communications enveloped by the privilege "are made to counsel in respect to the commission of some intended crime . . . ." *Supplee* v. *Hall*, 75 Conn. 17, 22–23, 52 A. 407 (1902) ("[t]he seal placed upon the consultations of counsel and client cannot be broken" where communications covered by privilege may render client "liable to a civil action by reason of actual or constructive fraud"); see also *State* v. *Barrows*, 52 Conn. 323, 325 (1885) (applying crime exception); *Dietter* v. *Dietter*, 54 Conn. App. 481, 504, 737 A.2d 926, cert. denied, 252 Conn. 906, 743 A.2d 617 (1999) (noting that exception to privilege applies only to criminal activity, not civil fraud).

The trial court determined that the plaintiff's failure to identify a criminal statute precluded the application of the crime exception. The trial court, however, did analyze the civil fraud issue "on the added assumption that our appellate courts will extend the exception to the privilege to civil fraud." With respect to the plaintiff's allegations of fraud, the court concluded that "[t]he fraud involved here is really alleged to be an attempt to mislead [the department] by false representations about the conditions at [the defendant's] plant."

We see no principled distinction between communications made to counsel with respect to the commission of some intended crime, and communications made

to counsel with respect to the commission of some intended fraud. We therefore adopt an exception to the attorney-client privilege when the privileged communications are made with the intent to further a crime or civil fraud. See footnote 6 of this opinion. Because we are embracing a decidedly new doctrine in Connecticut, it is necessary to delineate the contours of the crime-fraud exception.[11]

In *State* v. *Barrows*, supra, 52 Conn. 325, we determined that, in order for the crime exception to lie, the party seeking to abrogate the privilege must offer "reasonable evidence of . . . guilty intent." So too, the fraud exception requires some quantum of proof by the party seeking to pierce the privilege. "[I]t would be absurd to say that the privilege could be [eliminated] merely by making a charge of fraud." *Clark* v. *United States*, supra, 289 U.S. 15 (suggesting that there must be "prima facie evidence" of fraud); see also *United States* v. *Zolin*, supra, 491 U.S. 563 (not deciding quantum of proof necessary to establish applicability of crime-fraud exception).

We note the different terminology that courts have used in describing the appropriate standard of proof applicable to cases wherein a party opposing the privilege seeks to invoke the crime-fraud exception. See, e.g., *In re Grand Jury Proceedings*, supra, 183 F.3d 78 (requiring prima facie showing of fraud); *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998)

---

[11] We are cognizant that adhering to our precedent limiting the crime-fraud exception to criminal conduct might serve the ends of stare decisis, certainty and predictability. We view, however, as atavistic the notion that, on those grounds alone, we should refuse to acknowledge a widely employed legal rule that is rooted in sound reasons of policy. See *State* v. *Vakilzaden*, 251 Conn. 656, 663, 742 A.2d 767 (1999) (experience often "demonstrate[s] that a rule, once believed sound, needs modification to serve justice better" [internal quotation marks omitted]). Accordingly, to the extent that *Supplee* v. *Hall*, supra, 75 Conn. 22-23, is inconsistent with today's decision, it is hereby overruled.

(same), cert. denied sub nom. *Anderson* v. *United States*, 525 U.S. 966, 119 S. Ct. 412, 142 L. Ed. 2d 334 (1998); *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) (requiring evidence that, if believed by trier of fact, would establish elements of ongoing or imminent crime or fraud); *In re Grand Jury Proceedings*, supra, 87 F.3d 381 (requiring "reasonable cause to believe" client engaged in or intended to engage in crime or fraud); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring probable cause to believe crime or fraud was intended); *Cox* v. *Administrator, United States Steel & Carnegie*, 17 F.3d 1386, 1416 (11th Cir. 1994) (requiring prima facie showing of criminal or fraudulent conduct); *United States* v. *Davis*, 1 F.3d 606, 609 (7th Cir. 1993), cert. denied, 510 U.S. 1176, 114 S. Ct. 1216, 127 L. Ed. 2d 563 (1994) (same); *Haines* v. *Liggett Group, Inc.*, 975 F.2d 81, 95 (3d Cir. 1992) (requiring prima facie evidence "sufficient to support a finding" that elements of exception were met); *In re International Systems & Controls Corp.*, 693 F.2d 1235, 1242 (5th Cir. 1982) (requiring prima facie showing for exception in context of attorney work product privilege); *Shirvani* v. *Capital Investing Corp., Inc.*, 112 F.R.D. 389, 391 (D. Conn. 1986) (crime-fraud exception requires not mere allegation of misconduct, but prima facie or probable cause showing of grounds for prudent person to have reasonable basis to suspect perpetration of crime or fraud).

According to the Second Circuit Court of Appeals, proper application of the crime-fraud exception requires the court to determine that "there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." *In re Richard Roe, Inc.*, supra, 68 F.3d 40; see also *United States* v. *Doe, Inc.*, 168 F.3d 69, 70 (2d Cir. 1999) (same). Expounding on the probable cause requirement, the Second Circuit has

determined that the exception "requir[es] that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." (Internal quotation marks omitted.) *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994).

We consider the standard applied by the Court of Appeals for the Second Circuit to be an appropriate enunciation of the exception. We therefore also adopt the standard as our own. As articulated by the Second Circuit, the crime-fraud exception permits abrogation of the attorney-client privilege solely upon a determination by the trial court that there is probable cause to believe that the privileged communications were made with the intent to perpetrate a civil fraud and that the communications were made in furtherance of that fraud. See *United States* v. *Jacobs,* supra, 117 F.3d 87; see also *People* v. *Paasche,* 207 Mich. App. 698, 707, 525 N.W.2d 914 (1995) (for crime-fraud exception to apply proponent of exception must show that there is "reasonable basis to (1) suspect the perpetration or attempted perpetration of a crime or fraud and (2) that the communications were in furtherance thereof"); *State ex rel. Nix* v. *Cleveland,* 83 Ohio St. 3d 379, 384, 700 N.E.2d 12 (1998) (same).

This exception to the attorney-client privilege is a limited one. See *United States* v. *Doe, Inc.,* supra, 168 F.3d 71 (exception to attorney-client privilege "should not be framed so broadly as to vitiate much of the protection [the privilege] afford[s]"). Our reading of the Second Circuit's test leads us to conclude that the appropriate inquiry under the probable cause standard targets the client's intent in obtaining legal advice; only if there is probable cause to believe that the client intended to perpetrate a fraud does the exception properly come to bear.

"Without reference to intent, the privilege would be pierced whenever [probable cause] could be made that an illegal act occurred after the client conferred with an attorney—even if the consultation was part of a good-faith attempt to follow the law . . . . By focusing on intent, the exception clearly differentiates those communications that have been pursued to advance socially desirable ends from those pursued to circumvent the dictates of the law." "Developments in the Law—Privileged Communications," 98 Harv. L. Rev. 1450, 1513 (1985); See *United States* v. *Jacobs*, supra, 117 F.3d 88 (noting "strong emphasis on intent"); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (requiring "purposeful nexus"; exception applies "only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal [or fraudulent] activity"); *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, supra, 731 F.2d 1039 (crime or fraud must "have been the objective of the client's communication"). Heretofore, our own limited recognition of the exception focused precisely on the intent of the client in seeking legal advice to further a criminal objective. *State* v. *Barrows*, supra, 52 Conn. 325 (crime exception appropriate when communication "offer[s] reasonable evidence of [client's] guilty intent"). "Good-faith consultations with attorneys by clients who are uncertain about the legal implications of a proposed course of action are entitled to the protection of the privilege, even if that action should later be held improper." *State ex rel. North Pacific Lumber Co.* v. *Unis*, 282 Or. 457, 464, 579 P.2d 1291 (1978).

Even if probable cause exists to believe that the client intended to perpetrate a fraud, the exception is curtailed by the second requirement that the communications sought in discovery were made in furtherance of

the fraud. See *In re Richard Roe, Inc.*, supra, 68 F.3d 40. In that case, the Second Circuit Court of Appeals rejected a "relevant evidence" test under the second prong of the exception, adhering instead to a strict "in furtherance" requirement. Id. "[T]he crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." Id. Mere relevance is insufficient; there must be a showing that the communications at issue were " 'made with an intent to further an unlawful act.' " Id., quoting *United States* v. *White*, 887 F.2d 267, 271 (D.C. Cir. 1989).

Finally, we believe that the familiar burden-shifting exercise associated with a strict prima facie requirement is unnecessary in this context. Were we to adhere to a strict prima facie burden-shifting requirement, the proponent of the privilege, following the opponent's prima facie showing of fraud or criminal wrongdoing, would bear the burden of producing evidence to rebut the presumption of fraud or crime. See *Ireland* v. *Ireland*, 246 Conn. 413, 428, 717 A.2d 676 (1998) (discussing burden shifting in context of prima facie requirements for custodial parent seeking to relocate); *State* v. *Beltran*, 246 Conn. 268, 278, 717 A.2d 168 (1998) (discussing burden shifting in context of prima facie showing of racially discriminatory peremptory challenges); *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, 237 Conn. 209, 225–26, 676 A.2d 844 (1996) (discussing burden shifting in context of prima facie evidence of discriminatory discharge). We do not wish to burden trial courts unduly with a time-consuming exercise whereby fraud and criminal issues would require evidentiary hearings to determine the ultimate applicability of the exception. See *Caldwell* v. *District Court*, 644 P.2d 26, 32–33 (Colo. 1982) (noting that strict prima facie case may be impossible at discovery stage). Decisions

regarding discovery are best left to the trial court in its reasoned discretion; *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 57, 459 A.2d 503 (1983); and employing the typical prima facie burden shifting could lead to endless minitrials to settle discovery matters in the underlying action.[12] Accordingly, we reject a strict burden shifting approach and instead employ the test adopted by the Court of Appeals for the Second Circuit, which requires a showing of probable cause to believe that the privileged communications were made with the intent to perpetrate a civil fraud and that the communications were made in furtherance of that fraud. See *United States* v. *Zolin*, supra, 491 U.S. 563 n.7 (recognizing "confusion" caused by prima facie language); *Matter of Mendel*, 897 P.2d 68, 74 (Alaska 1995) (" '[o]nce a litigant has presented prima facie evidence of the perpetration of a fraud or crime in the attorney-client relationship, the other party may not then claim the privilege' "); *Caldwell* v. *District Court*, supra, 644 P.2d 32–33 (burden is on party asserting exception).

B

In the present case, the trial court determined that in order for the exception to apply, "a prima facie showing [of fraud] is sufficient." Using language from *State* v. *Barrows*, supra, 52 Conn. 325, the trial court determined that there must be "reasonable evidence" that a fraud was intended. Thus, the standard of proof employed by the trial court to determine the applicability of the exception was consonant with the articulation of the term probable cause that we adopt today and also in accord with our own interpretation of that term. See

[12] See D. Fried, "Too High A Price For Truth: The Exception to the Attorney-Client Privilege for Contemplated Crimes and Frauds," 64 N.C. L. Rev. 443, 445–46 (1986) (noting that "crime-fraud exception is exploited in discovery to harass the opponent's attorneys and even to compel their disqualification," and arguing that "the exception has been abused and distorted . . . to the point where the attorney-client privilege has been seriously eroded").

*In re John Doe, Inc.*, supra, 13 F.3d 637 (probable cause requires "reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud"); *State* v. *Eady*, 249 Conn. 431, 440, 733 A.2d 112 (1999) (probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind").

Applying that test, the trial court made several factual findings that have not been challenged on appeal. Specifically, the trial court concluded that the order did not require the defendant to submit the Diaz report to the department. Its conclusion rested on a review of the applicable statutes and its recognition that the defendant had requested a hearing, as well as the fact that the department had been negotiating with the defendant to reach an agreement regarding compliance. Additionally, the trial court found no regulations that would impose a duty upon a regulated business "to report to [the department] all possible hazardous waste violations that might be occurring or had occurred on its premises," and determined that the order contemplated action with respect only to the two sites identified in the inspection report. Based on its findings that the department did not expect to receive any information beyond that relating to the potential contamination around the two sites identified, the trial court concluded that failing to submit the entire Diaz report, which revealed other areas of potential contamination, was not an intended fraud on the department predicated on misrepresentation or false reporting. The trial court concluded that the plaintiff had failed to make a prima facie showing that established "reasonable evidence" of fraud, and that neither the defendant's nor Briggs' actions or communications "precluded, inhibited, or delayed the [department] from finding out about the [alleged] additional hazardous waste problems mentioned in the Diaz report." Accordingly, the trial court upheld the defendant's claim of privilege. The Appellate

Court did not address the applicability of the crime-fraud exception, but indicated that, even if Connecticut were to apply the exception to civil fraud, it would agree that, based on the trial court's findings with respect to the absence of evidence demonstrating civil fraud, the exception would not apply here. *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 54 Conn. App. 524–25 n.6.

The plaintiff pursues the same arguments here and maintains that, in refusing to submit the entire Diaz report pursuant to Briggs' advice, the defendant misled the department concerning additional areas of potential waste contamination. The plaintiff also asserts that the defendant and Briggs "deflected and denied" the department the opportunity to pursue the additional areas due to the Briggs notice to Environmental Management. The plaintiff contends that the Briggs notice, wherein Briggs suggested to Environmental Management that it separate or delete portions of the Diaz report, coupled with Briggs' subsequent instructions to the defendant to remove from the Diaz report those findings concerning the additional sites that were not the subject of the department's inquiry, amounted to fraud.

All of the plaintiff's claims regarding alleged fraud on the department are predicated on facts that are contrary to those found by the trial court. The trial court revisited those findings in light of additional deposition testimony proffered by the plaintiff from Susan Zampaglione, a district supervisor at the department, and concluded that they were sound. The trial court then reaffirmed those findings in granting the defendant's motion in limine and subsequent motion to dismiss.

Nonetheless, the plaintiff asserts that Briggs' statement to the department, namely, that "delays" by Environmental Management were the reason it had failed to submit a final version of the Diaz report, constituted

part of the fraud. The trial court, however, found that Briggs had requested that Environmental Management submit separate reports concerning the areas of the defendant's plant identified in the inspection report and those areas that were not the subject of the department's inquiry. The trial court further found that Environmental Management had refused to submit separate reports. Although we acknowledge that Briggs might have been more forthcoming with the department concerning the status of the environmental investigation and informed it that the Diaz report was incomplete because she had fired Environmental Management for refusing to separate the portions she deemed unresponsive to the order, the trial court reasonably concluded that "[t]here is no claim . . . that fraud was perpetrated on the [department] by any delay in providing the agency with testing results as to the two areas of concern mentioned in the October, 1989 [inspection] report . . . ." Without an affirmative duty to disclose any information regarding the additional sites that the trial court determined were not the subject of the order, we fail to see how informing the department that the defendant was experiencing delays in obtaining a final report that would be responsive to the order could amount to misrepresentation or fraud.

We note that "[a] failure to disclose can be deceptive only if, in light of all the circumstances, there is a duty to disclose." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 523, 646 A.2d 1289 (1994); see also *Duksa* v. *Middletown*, 173 Conn. 124, 127, 376 A.2d 1099 (1977) (for nondisclosure to amount to fraud, there must be failure to disclose known facts and circumstances that impose duty to speak). Given the fact that the department did not expect an all encompassing environmental audit in this case, the trial court determined that there was no "reasonable evidence" establishing a prima facie showing

that the defendant had intended to perpetrate a fraud on the department.

The plaintiff also asserts that the defendant fraudulently deceived the department by failing to reveal the existence of the other potential areas of contamination during the department's inspection. The plaintiff makes this argument even though there are no factual findings concerning the defendant's knowledge of the contamination prior to the inspection. The plaintiff concedes that he has not made an evidentiary showing, but contends that he has "clearly demonstrated" that evidence of illegal waste discharge and storage was withheld from the department.

Notably, the trial court found it "unclear" from the Diaz report whether the alleged additional areas of contamination, beyond those identified in the inspection report, involved past or ongoing violations. Indeed, although the plaintiff asserts that the defendant, at the behest of its attorney, Briggs, proceeded to "bury" and cover up the potential hazardous waste violations in the additional areas of the plant, any factual findings in support of his claim are conspicuously absent. The plaintiff concedes as much in his brief. In the absence of any findings concerning the nature of the potential contamination in the additional areas of the defendant's plant, or evidence that the defendant sought legal advice in pursuit of an alleged "burial" of the waste at these sites, the trial court properly concluded that the requirements for an application of the fraud exception were not satisfied. Based on the trial court's findings, there was no evidence that the defendant sought legal advice with the intent to perpetrate a fraud on the department by withholding information, or that Briggs, as the defendant's attorney, intended to defraud the department by withholding information. Therefore, we conclude that the trial court properly declined to apply the crime-fraud exception to the facts of this case.

## C

Finally, we note that the present case represents a departure from the usual situation involving privileged communications sought in discovery. The plaintiff is in possession of all of the privileged material; in fact, he came into possession of both the Diaz report and the Briggs notice in his capacity as the defendant's employee. Thus, there was no risk of disclosing the privileged material to an adverse party through an examination of the documents themselves in order to determine whether the exception applied.

In the typical case, the party seeking to invoke the exception will not know exactly what the privileged communications include. We therefore endeavor to set forth the procedures to be used in reviewing a claim concerning the crime-fraud exception and the type of evidence permissible for a threshold factual showing in future cases. See *Ireland* v. *Ireland*, supra, 246 Conn. 433 (adopting factors to consider in future child custody relocation cases). The proponent of the exception may, in appropriate circumstances, request an in camera review of the privileged information to allow the court to make a determination regarding the applicability of the exception. See *United States* v. *Zolin*, supra, 491 U.S. 568–69 (concluding that neither Federal Rules of Evidence nor federal common law prohibits party opposing privilege on crime-fraud grounds from relying on in camera review of communications). We recognize that encouraging an in camera review in all cases is ill-advised due to the fact that "[t]oo much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect . . . ." (Internal quotation marks omitted.) Id., 570–71; see also *In re John Doe, Inc.*, supra, 13 F.3d 636 (where concerns for secrecy are weak, in camera proceeding may not be justified). We have permitted an in camera review in other contexts and conclude that, in certain circum-

stances, it may be an appropriate means of examining the allegedly privileged material without abrogating the privilege itself. See, e.g., *State* v. *Ortiz*, 252 Conn. 533, 557, 747 A.2d 487 (2000) (discussing standard that criminal defendant must meet to obtain in camera inspection of witness' confidential records sought for impeachment purposes); *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 846–49, 742 A.2d 322 (1999) (discussing attorney-client privilege and in camera review in context of medical peer review statute).

The decision of whether to engage in an in camera review of the allegedly privileged information is necessarily one for the trial court. From a procedural perspective, "[b]efore engaging in in camera review to determine the applicability of the crime-fraud exception, the [trial] judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." (Citation omitted; internal quotation marks omitted.) *United States* v. *Zolin*, supra, 491 U.S. 572; see also *United States* v. *Jacobs*, supra, 117 F.3d 87 (describing "two-step process" involving discretion at both stages). This threshold showing rests in the sound discretion of the trial court, which should consider "the facts and circumstance of the particular case, including . . . the volume of materials . . . the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other evidence then before the court, will establish that the crime-fraud exception does apply." *United States* v. *Zolin*, supra, 572; see also *In re John Doe, Inc.*, supra, 13 F.3d 636 (determining that in camera procedure comports with due process). As to the type of evidence permitted to meet this threshold showing, the party seeking to invoke the exception may offer

"any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged." *United States* v. *Zolin*, supra, 575; *In re John Doe, Inc.*, supra, 636 (recognizing that *Zolin* "established that only non-privileged material may be used to make the threshold determination that triggers in camera review").

## III

In conclusion, the Appellate Court properly affirmed the trial court's decision to extend the attorney-client privilege to the report compiled by the environmental consultant and to the related communications because they were made in confidence for the purpose of obtaining legal advice. We also conclude that the trial court properly deemed the fraud exception inapplicable to the facts of the present case. That exception requires a showing of probable cause to believe that the proponent of the privilege intended to commit a fraud and that the communication was made in furtherance of the fraud. On the basis of the evidence presented by the plaintiff, he has failed to meet this burden and, therefore, the fraud exception was properly held inapplicable.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.